UNITED STATES of America

v.

Joseph CUSUMANO, Appellant.

No. 90–1931.

United States Court of Appeals,
Third Circuit.

Argued May 14, 1991.
Decided Aug. 28, 1991.

Thomas B. Rutter (argued), Rutter, Turner, Solomon & DiPiero, Philadelphia, Pa., for appellant.

Michael M. Baylson, U.S. Atty., Walter S. Batty, Jr., Robert E. Goldman (argued), Peter F. Schenck, Asst. U.S. Attys., Philadelphia, Pa., for appellee.

Before HUTCHINSON, COWEN and SEITZ, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

Joseph Cusumano appeals his conviction and sentence pursuant to his involvement in a kickback scheme concerning an employee benefit plan. The district court had jurisdiction under 18 U.S.C. § 3231 (1988). This court has jurisdiction under 28 U.S.C. § 1291 (1988).

## I. FACTS

Viewing the evidence in the light most favorable to the government, the facts relevant to this appeal are as follows. Certain union locals and retail food stores maintained the Retail Clerks Tri-State Health and Welfare Fund ("Fund") which administered various benefit programs for approximately 14,000 retail food workers. The Fund was managed by a board of trustees ("Board") that met regularly to discuss matters related to the Fund. John Bogan was the Fund's administrator, acting under the direction of the Board.

The Board contracted with various companies to provide benefit services to the Fund for the Fund's beneficiaries. One of these companies was Health Corporation of America (HCA), which provided and administered dental benefit coverage. Cusumano was president of HCA. In that capacity he appeared before the Board at its regular meetings.

In the early 1980's the Board instructed Bogan to solicit bids for life insurance benefit coverage to be provided by the Fund. Although he was not an official of the Fund, at some point not disclosed by the record, Cusumano learned of the Board's plan to purchase life insurance coverage. Thereafter Cusumano approached insurance agent Dennison Fincke to discuss Fincke's becoming the agent for the life insurance plan. Cusumano explained that he himself was not allowed to be the broker for life insurance coverage because he was already a vendor for the dental plan. Cusumano told Fincke that he and Fincke would "split the commission 50–50." When Fincke advised Cusumano that he had obtained a bid from an insurance company that would yield a fifteen percent commission, Cusumano instructed Fincke to obtain a bid providing a twenty percent commission. Cusumano and Fincke discussed how Fincke would set up and use a dummy offshore corporation to avoid paying taxes on the commissions.

Cusumano also met with Bogan to solicit his agreement to entertain Fincke's bid, telling him that "he would be taken care of" if the Board accepted Fincke's bid. Bogan recommended Fincke's bid to the Board, which approved it. Fincke's bid contained a misrepresentation of the amount of the commission, proposing an annual $12,000 commission when in actuality he would receive almost $100,000 annually.

From 1982 to 1988 Fincke received monthly commission checks of approximately $8000 as agent for the life insurance plan. Fincke deposited the checks as he and Cusumano had agreed and paid

Cusumano his one-half share in cash. Cusumano paid Bogan $400 a month. In 1986 Fincke set up a bank account in the Cayman Islands for the commission payments, and Cusumano traveled to the Cayman Islands twice to collect his share from Fincke. Thereafter, Fincke sent Cusumano the payments by check, which Cusumano then deposited into his father's or secretary's bank account.

On February 22, 1990, Cusumano was charged in a 49–count indictment as follows: one count of conspiracy under 18 U.S.C. § 371; four counts of embezzlement from an employee benefit plan under 18 U.S.C. § 664; thirty-five counts of receipt of kickbacks relating to an employee benefit plan under 18 U.S.C. § 1954; seven counts of laundering the proceeds of an unlawful activity under 18 U.S.C. § 1956; and two counts of foreign travel in aid of a racketeering enterprise under 18 U.S.C. § 1952. All counts save the conspiracy and money laundering counts also charged Cusumano with aiding and abetting under 18 U.S.C. § 2. Bogan was also charged in the indictment but later entered into a plea agreement. Both Bogan and Fincke appeared as government witnesses in Cusumano's trial.

On July 25, 1990, the jury returned a verdict of guilty on all counts. The district court imposed multiple three and six year prison terms for Cusumano's pre-Guidelines conduct and multiple Guidelines terms of 71 months, all to run concurrently. Significant fines and restitution were also imposed under the Guidelines. Final judgment of conviction and sentence was entered December 7, 1990, and Cusumano appealed to this court.

## II. DISCUSSION

Cusumano seeks acquittal on all counts except the embezzlement counts, as to which he seeks a new trial. He also challenges certain aspects of his prison sentence under the Sentencing Guidelines.

Cusumano's primary argument for acquittal concerns his convictions under § 1954, and we turn first to that provision.

### A. Section 1954

Cusumano contends that he is entitled to acquittal on the thirty-five counts directly related to the kickback scheme under 18 U.S.C. § 1954 (1988). That section subjects the following persons to criminal liability:

Whoever being:

(1) an administrator, officer, trustee, custodian, counsel, agent, or employee of any employee welfare benefit plan … [1] or

. . . .

(4) a person who, or an officer, counsel, agent, or employee of an organization which, provides benefit plan services to such plan

receives or agrees to receive or solicits any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced with respect to, any of his actions, decisions, or other duties relating to any question or matter concerning such plan. … [2]

This court has characterized this provision broadly to reach "all persons who exercise control, direct or indirect, authorized or unauthorized, over the fund." *United States v. Palmeri*, 630 F.2d 192, 199–200 (3d Cir.1980), *cert. denied*, 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981) (cited in *United States v. Soures*, 736 F.2d 87, 90 (3d Cir.1984); *United States v. Friedland*, 660 F.2d 919, 925, 927 (3d Cir.1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2268, 73 L.Ed.2d 1283 (1982)).

The § 1954 counts of the indictment charged that Cusumano

… did knowingly and unlawfully solicit and receive … a fee, kickback, commission, gift, money and thing of value, that is, currency and securities … from an insurance agent … because of and with intent to be influenced, in respect to [his]

---

**1.** The section defines "welfare benefit plan" by reference to Title I of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001–1168 (1988) ("ERISA").

**2.** The indictment makes clear that only the quoted portion of § 1954 is potentially applicable to Cusumano in this case. Thus other portions of the section are omitted.

actions, decisions and other duties relating to questions and matters concerning the Fund, that is, the placement of insurance coverage for the Fund with an insurance agent. . . .

Cusumano raises two legal challenges to his § 1954 convictions. First, he asserts that the Fund was not an ERISA welfare benefit plan. Second, he contends that the Fund cannot be the subject of his § 1954 prosecution because the scheme involved only the life insurance plan.

### 1. *Was the Fund an ERISA Plan?*

■ As noted above, the government's theory in this case was that Cusumano held the necessary position of influence with respect to the Fund. Cusumano contends that § 1954 does not encompass such a theory because the Fund is not a "welfare benefit plan" within the meaning of ERISA. Consequently, Cusumano argues that the government failed to prove the first element of a § 1954 prosecution, i.e., that the plan in question was a welfare benefit plan under ERISA.

Initially, we note that the question whether the Fund was a welfare benefit plan under ERISA was submitted to the jury without objection from Cusumano. In fact Cusumano delayed until oral argument in this court before raising this issue. Therefore, our power to grant relief is limited to circumstances in which the district court's instruction to the jury was plain error affecting substantial rights. *See* Fed.R.Crim.P. 30, 52(b). Given that the challenge to the construction of the statute goes to the existence *vel non* of criminal responsibility, we think that the error, if such it was, would affect Cusumano's due process rights and would constitute plain error. *United States v. Piccolo*, 835 F.2d 517, 519 (3d Cir.1987), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). We therefore turn to the merits of Cusumano's contention.

Title I of ERISA defines a "welfare benefit plan" or "welfare plan," in relevant part, as

any plan, fund, or program . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing . . . (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1).[3]

Cusumano contends that the Fund is not a welfare benefit plan because it provides more than one of the listed types of benefits. Thus, he construes narrowly the quoted disjunctive language to exclude from ERISA coverage any plan that provides more than one type of benefit. He supports his position by arguing that each individual benefit plan under the Fund, including the dental and life insurance plans, requires a separate application and approval by federal agencies such as the Department of Labor and the Internal Revenue Service.

According to the language of ERISA, 29 U.S.C. § 1002(1), the Fund is a welfare benefit plan "to the extent" it was established or maintained for the purpose of providing any of the listed benefits. *See Donovan v. Dillingham*, 688 F.2d 1367, 1371 n. 5 (11th Cir.1982) (in dicta, "plan . . . furnishing both benefits listed in . . . § 1002(1) and benefits not listed . . . is subject to ERISA to the extent the plan . . . has as its purpose the providing of the enumerated benefits"). The Fund provided, in addition to other benefit plans, dental and life insurance plans for the benefit of the employees it served. Both of these fall within the benefits enumerated in

---

**3.** Section 186(c), a provision of the Labor Management Relations Act, refers to, *inter alia,* pooled vacation, holiday and severance benefits. 29 U.S.C. § 186(c)(6) (1988). The effect of § 1002(1)(B) "is to include in the definition of 'welfare plan' those plans which provide holiday and severance benefits, and benefits which are similar (for example, benefits which are in substance severance benefits, although not so characterized)". 29 C.F.R. § 2510.3–1(a)(3) (1990).

§ 1002(1), which Cusumano does not dispute. Therefore, to the extent that it provided both dental and life insurance benefits, the Fund was a "welfare benefit plan." To read the statute in any other way would be contrary to the plain meaning of its language. It follows from this conclusion that the fact that separate applications may have to be filed with different government agencies, and their separate approvals obtained, does not alter our analysis. Thus we reject Cusumano's construction. Given our conclusion, it is not suggested that the ultimate question was not for the jury. Therefore, the district court did not err in submitting the § 1954 counts to the jury.

### 2. Can the Fund be the Subject of Cusumano's § 1954 Prosecution?

■ Cusumano challenges the government's use of the Fund as the relevant plan in this case. He contends that in referring to a welfare benefit plan and to "such plan," § 1954 refers to the specific plan that is the subject of the kickback scheme. Further, he argues that in this case it was the life insurance plan alone that was the subject of the kickback scheme. Thus it is his position that the government was required to prove Cusumano's relationship to the life insurance plan.[4]

Cusumano invokes our plenary standard of review on this challenge. It is not entirely clear whether the government invokes the plenary or substantial evidence standard of review. We shall assume, without deciding, that the plenary standard governs our review.

Once it is established that the plan in question is an ERISA plan, the government must prove two elements under § 1954. First, it had to establish that Cusumano was "an administrator, officer, trustee, ... agent, or employee of" *the plan* or "a person who, or an officer, counsel, agent, or employee of an organization which, provides benefit plan services to *such plan.*"

Next, the government had to prove that Cusumano received a kickback "because of or with intent to be influenced with respect to, any of his actions ... relating to any question or matter concerning *such plan.*" Cusumano raises no challenge to the sufficiency of the government's proof as to either element if the *Fund* is the relevant plan. Rather, he contends that such proof is irrelevant because his relationship to the *life insurance plan* is the requisite focus, since it was that plan that was the subject of the kickback scheme.

We agree with Cusumano that the language "such plan" refers to the same plan to which the defendant bears the relevant relationship. Further, because the wrongful transaction must involve "such plan," we also agree that the plan to which the defendant bears the relationship must be the plan that is the subject of the kickback scheme. The question, then, is whether the Fund was a subject of the kickback scheme. If it was, the Fund was properly the subject of the § 1954 counts.

We understand Cusumano to be arguing that because the kickback scheme involved the premiums paid by the Fund for life insurance coverage, the relevant plan for § 1954 purposes was the life insurance plan. However, the issue is not whether the life insurance plan could be the subject of a § 1954 prosecution, but whether the Fund could be. While he does not state his argument in this way, the necessary implication of Cusumano's position is that the Fund was not involved in the kickback scheme. However, Cusumano does not explain why it is that the Fund was not defrauded, nor would such an argument be convincing on the facts of this case.

The evidence demonstrates that the Fund was established for the purpose of providing various types of benefits through the purchase of individual insurance contracts. The Board, on the Fund's behalf, accepted Fincke's proposed bid to purchase life insurance coverage from an insurance com-

---

4. If Cusumano can be read to be arguing that the indictment charged that he received kickbacks "because of or with intent to be influenced with respect to, any of his actions ... relating to" the life insurance plan, we think the simple answer is that the indictment charged instead that he received kickbacks relating to the Fund.

pany. That bid was the product of the scheme orchestrated by Cusumano. The money the Fund used to pay for the life insurance coverage went in part to Cusumano under the scheme. Therefore, we cannot say, as a matter of law or fact, that the Fund was not the subject of the kickback scheme. We therefore reject Cusumano's contention.

In consequence, we reject Cusumano's challenges to his § 1954 convictions. We need not address the government's alternative theory that he was properly convicted as an aider and abetter. Nor need we address Cusumano's arguments for acquittal on the conspiracy, money laundering and travel counts, because they concededly are predicated upon a reversal of his § 1954 convictions.

### B. Embezzlement Counts

Cusumano seeks a new trial on the counts charging him with embezzlement under 18 U.S.C. § 664. That provision imposes criminal liability on

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any [ERISA] employee welfare benefit plan ... or of any fund connected therewith....

> The indictment charged that Cusumano did embezzle, steal and unlawfully and willfully convert to [his] own use ... the moneys, funds, securities, premiums, credits, property and other assets of the Fund....

Cusumano assigns two grounds of error in the district court's charge to the jury. It is suggested at the outset by both parties that we should review these objections only for plain error. The record is not entirely clear as to whether the objections were preserved. However, because of our conclusion, we will proceed to address the merits under the abuse of discretion standard as if the objections had been preserved. *See United States v. Santos,* 932 F.2d 244, 247 (3d Cir.1991); *United States v. Beros,* 833 F.2d 455, 458 n. 3 (3d Cir.1987).

Cusumano first argues that the district court improperly charged the jury in the disjunctive rather than conjunctive. He asserts that, although § 664 is written in the disjunctive, the indictment charged in the conjunctive, and thus the district court, in instructing the jury in the disjunctive, permitted the jury to go beyond the indictment.

Where the relevant statute lists alternative means of violation, "[t]he general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive ... the verdict stands if the evidence is sufficient with respect to any of the acts charged." *Turner v. United States,* 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970). This rule obviously extends to a trial court's jury instructions in the disjunctive in the context of a conjunctively worded indictment. *See United States v. Klein,* 850 F.2d 404, 405–06 (8th Cir.), *cert. denied,* 488 U.S. 867, 109 S.Ct. 173, 102 L.Ed.2d 143 (1988); *United States v. Schiff,* 801 F.2d 108, 114 (2d Cir.1986), *cert. denied,* 480 U.S. 945, 107 S.Ct. 1603, 94 L.Ed.2d 789 (1987); *United States v. Uzzolino,* 651 F.2d 207, 210 n. 2 (3d Cir.), *cert. denied,* 454 U.S. 865, 102 S.Ct. 327, 70 L.Ed.2d 166 (1981). Cusumano does not argue that the evidence was insufficient with respect to any of the acts charged. Therefore, the failure to charge in the conjunctive cannot be treated as an improper amendment of the indictment. We thus conclude that the district court's charge did not constitute an abuse of discretion.

Next, Cusumano argues that the district court should have given a specific unanimity instruction on the embezzlement counts under *United States v. Beros,* 833 F.2d 455 (3d Cir.1987). He states that the district court gave merely a general unanimity instruction, but failed to specify to the jury that it must be unanimous in concluding that Cusumano committed one of the disjunctive acts. Thus he argues that the jury might have thought that it could convict as long as each of them believed he committed one of the listed offenses but

without being unanimous as to any offense. His proposed point for charge illustrates his grievance. Cusumano proposed that, after charging as to the disjunctive list of offenses, the district court instruct the jury that "you are instructed that ... the jury must unanimously agree on one or more of these charged elements."

The *Beros* rule comes into play only when the circumstances are such that the jury is likely to be confused as to whether it is required to be unanimous on an essential element. As we stated in *Beros,* the need for a specific unanimity instruction is the exception to the "routine case" in which a "general unanimity instruction will ensure that the jury is unanimous on the factual basis for a conviction, even where an indictment alleges numerous factual bases for criminal liability." 833 F.2d at 460.

In *Beros* the government charged the defendant under a disjunctively worded statute, alleging that the defendant violated that statute by engaging in three separate and different acts. This court held that it was an abuse of discretion not to specifically instruct the jury that it had to be unanimous as to at least one of the three acts committed. *Id.* at 460–63. Here, the government did not allege different sets of facts, and the only possible confusion arose from the disjunctive nature of the charge under the statute. There is insufficient risk of confusion in such circumstances and the need for a specific unanimity instruction was not triggered. *See United States v. Jackson,* 879 F.2d 85, 89 (3d Cir.1989). Therefore, the district court's charge did not constitute an abuse of discretion and a new trial is not warranted.[5]

### C.  Sentencing Challenges

Cusumano presents three challenges to his sentence. Although his notice of appeal stated that he was appealing from "the final judgment of sentence," Cusumano's brief makes clear that his sentencing challenges pertain only to the prison sentence imposed under the Guidelines, and our review is thus confined to those issues.[6] He challenges the base offense level assigned, an upward adjustment for "aggravating role," and an upward adjustment for obstructing justice. His arguments present both factual and legal challenges, and our standard of review is determined accordingly.

#### 1.  *Base Offense Level*

Cusumano first contends that the district court improperly relied on the money laundering counts to determine his base offense level. Guidelines § 3D1.1 directs a district court, in the case of convictions on multiple counts, to group the counts into "Groups of Closely–Related Counts" under § 3D1.2, and then to determine the offense level applicable to each group under § 3D1.3. Under § 3D1.2(b), counts are grouped together when they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting a part of a common scheme or plan." Under § 3D1.3(a), the district court is instructed to assign the offense level "for the most serious of the counts comprising the Group, *i.e.,* the highest offense level of the counts in the Group."

The district court, rejecting Cusumano's argument that the money laundering offenses were "ancillary" to the primary kickback offenses, concluded that "the money laundering ... is very much in the thick of this entire scheme." On that basis

---

**5.** We note that Cusumano cites *United States v. Dansker,* 537 F.2d 40, 51 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977), in the context of his argument under *Beros. Dansker* is inapplicable here for a variety of reasons, not the least of which is that this court has not reversed Cusumano's conviction on any count.

**6.** The offenses which were the basis of the Guidelines sentences occurred prior to the effective date of the current Guidelines, November 1, 1990. Both the parties and the district court refer to the current Guidelines without mention of this fact. Because our disposition is unaffected by amendments to the Guidelines in effect at the time of the offenses, we also will apply the current version.

the court grouped the money laundering offenses with the other offenses for the purposes of determining the offense level. The district court assigned a base offense level of 23 under Guidelines § 2S1.1(a) relating to money laundering.[7]

Cusumano contends that the district court erred in relying on the money laundering counts to determine the base offense level. He argues that the money laundering counts were not related, but were ancillary, to the other counts in the indictment. This contention requires us to determine whether the counts were properly grouped under § 3D1.2(b).

We have previously stated that a construction of § 3D1.2 is a legal issue for our plenary review. *See United States v. Riviere*, 924 F.2d 1289, 1304 (3d Cir.1991). However, in that case the issue was "whether offenses for which society is the victim are properly grouped together...." In contrast, Cusumano's particular objection requires us to decide whether his various offenses were part of one overall scheme, which we view as an "essentially factual" issue. On that basis, our review of the district court's determination that the offenses were not "ancillary" is governed by the clearly erroneous standard. *See United States v. Ortiz*, 878 F.2d 125, 126–27 (3d Cir.1989).

Cusumano contends that the evidence showed that Fincke made all the arrangements concerning the handling of the money, and that Cusumano played a minimal role in the conduct that was the basis for the money laundering counts. Thus he contends that the money laundering offenses were ancillary to the "real" charged offense, the kickbacks.

Even if we were to accept his dubious characterization of the facts, Cusumano's argument does not defeat the application of § 3D1.2(b) to this case. Cusumano was convicted under the money laundering statute, 18 U.S.C. § 1956. The issue here under the Guidelines is whether those convictions and his other convictions "involve the same victim and two or more acts or trans-

actions connected by a common criminal objective or constituting a part of a common scheme or plan." The victim of all offenses in this case was the Fund and its beneficiaries. The evidence demonstrated that the unlawful kickbacks, the embezzlement, the conspiracy, the travel act violations and the money laundering were all part of one overall scheme to obtain money from the Fund and to convert it to the use of Cusumano, Fincke and Bogan. Therefore, the district court's conclusion that the money laundering offenses were not "ancillary" is not clearly erroneous.

While less than clear, Cusumano also seems to contend that, even if the district court properly applied the language of § 3D1.2(b) to group the counts together, that result is inconsistent with the overall intent of the Guidelines which is to sentence on the bases of a "real offense" system rather than a "charge offense" system. He argues that the "real" or "core" offenses of which he was convicted were those involving the kickback scheme, and he should thus be sentenced on that basis. This objection does raise an issue of construction, and our review is plenary. *See Riviere*, 924 F.2d at 1304.

Cusumano relies on various statements of the Sentencing Commission in the Guidelines. First, he points to an introductory policy statement in which the Commission described its approach to the question "whether to base sentences upon the actual conduct in which the defendant engaged regardless of the charges for which he was indicted or convicted ('real offense' sentencing), or upon the conduct that constitutes the elements of the offense for which the defendant was charged and of which he was convicted ('charge offense' sentencing)." U.S.S.G. Ch. 1, part A, 4(a) (discussed in *United States v. Kikumura*, 918 F.2d 1084, 1099 & n. 14 (3d Cir.1990)). The Commission goes on to state that the process through which it created the Guidelines resulted in a compromise, one that was "close to a charge offense system" but that "contain[s] a significant number of

---

7. Cusumano contends that the district court should have assigned a base offense level under

Guidelines § 2E5.1(a)(2) relating to violations concerning employee welfare plans.

real offense elements." *Id.* In contrast to Cusumano's contention, this discussion does not evidence the Commission's intent to adhere to a "real offense" system. Therefore, the district court was correct to apply the plain language of the specific Guidelines.

Cusumano also points to Guidelines § 1B1.2, a general application principle describing how a district court is to determine the applicable guidelines. That guideline directs the court to "[d]etermine the offense guideline section in Chapter Two (Offense Conduct) most applicable to the offense of conviction (*i.e.*, the offense conduct charged in the count of the indictment or information of which the defendant was convicted)." Cusumano points to the words "most applicable" to support his view of the Guidelines.

Guidelines § 1B1.1 is of no help to Cusumano, however. That provision instructs a district court how to proceed in imposing a sentence. The first step, which is what is described in § 1B1.2, is to "[d]etermine the applicable offense guidelines section from Chapter Two." *See* U.S.S.G. § 1B1.1(a). That is only the first step, however, in a complex procedure. For example, § 1B1.1(d) instructs the court, in the case of multiple counts, to determine the applicable offense guidelines section for each of the counts, and then to group the counts according to Part D of Chapter III, just as occurred in this case. Cusumano's reliance on a portion of the language of § 1B1.2 is therefore simplistic, and we reject it as without merit.

We find no error in the district court's determination of the base offense level.

### 2. *Aggravating Role*

■ Second, Cusumano argues that the district court erred in making an upward adjustment of two levels on the basis of his "aggravating role" under Guidelines § 3B1.1. Because the adjustment is based on the district court's factual determination, our review is defined by the clearly erroneous standard. *See Ortiz,* 878 F.2d at 127.

Guidelines § 3B1.1(c) directs a district court to increase the offense level by two levels "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than [one involving five or more participants]." [8] The district court in this case determined that "the defendant's posture here was not one of a mere suggestor of commission of the offense, but indeed consisted of his recruitment of accomplices, his participation in planning, organizing the offense." On that basis, the district court adjusted the offense level upward.

Cusumano relies on evidence indicating that Fincke and Bogan exercised decision-making authority over the scheme and participated and profited to a greater extent that did he. Again, even assuming that the evidence suggests that Fincke and Bogan played aggravating roles, that does not help Cusumano. He seems to suggest that because others were leaders, he cannot be. This position was clearly rejected by the Sentencing Commission. *See* U.S.S.G. § 3B1.1, comment. (n. 3). Further, Cusumano did far more than to merely suggest the commission of the offenses. *See id.*

The evidence supports the district court's conclusions that Cusumano played a more central role. For example, it was Cusumano who first approached both Fincke and Bogan to suggest the scheme. It was Cusumano who demanded that Fincke obtain a twenty percent commission rate to increase their return, and who told Bogan that if the Board accepted the proposal Bogan would "be taken care of." Further, Cusumano participated in organizing all as-

8. The factors involved in a court's determination under this section include the following: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning and organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. *See* U.S.S.G. § 3B1.1, application note 3; *United States v. Gonzalez,* 918 F.2d 1129, 1138 n. 9 (3d Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. ·1015, 112 L.Ed.2d 1097 (1991).

pects of the scheme, including the financial transactions. The district court's conclusion that Cusumano played an aggravating role is not clearly erroneous, and thus the district court did not err in making the upward adjustment. *See Gonzalez,* 918 F.2d at 1139.

### 3. *Obstruction of Justice*

[8] Finally, Cusumano contends that the district court improperly adjusted his offense level upward under Guidelines § 3C1.1 relating to "Obstructing or Impeding the Administration of Justice" based on his statements to the probation officer concerning his financial circumstances.

Guidelines § 3C1.1 provides for a two-level upward adjustment where "the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation, prosecution, or sentencing of the" offense. Application note 3(h) specifically states that the furnishing of "materially false information to a probation officer in respect to a presentence or other investigation" is grounds for an adjustment.

The district court found that Cusumano told the probation officer, upon questioning as to his financial resources, that stock which he owned was "essentially worthless." In fact, the court found that "[t]here was a very vigorous, ongoing, well-nigh concluded negotiation to sell the aforesaid for over a half million dollars, which of course, is not well-nigh worthless." The district court concluded that Cusumano's statement to the probation officer was "at the very best a half truth," and that he had engaged in "willful misleading of the Probation authorities." On that basis the court adjusted Cusumano's offense level upward pursuant to § 3C1.1. We read the district court to have implicitly concluded that the false information provided by Cusumano was "material."

Cusumano disputes that the information he provided was false. He asserts that the evidence shows that at the time of his statements to the probation officer the negotiations involving the sale of Cusumano's stock were preliminary. Our review of the district court's finding that Cusumano lied and willfully mislead the probation officer is governed by the clearly erroneous standard. *See United States v. McDowell,* 888 F.2d 285, 292 (3d Cir.1989).

We do not disagree that the sale of Cusumano's property might not have been completed at the time of his interview by the probation officer. However, that does not make the district court's conclusion clearly erroneous. Cusumano's report that his property was "essentially worthless" is entirely inconsistent with the fact that he was negotiating the sale of that property, even apart from the actual magnitude of the value of the sale. The sale need not have been consummated to give the property value. Therefore, the district court's finding that Cusumano lied about his financial resources was not clearly erroneous.

Cusumano also states that, even if his report were "less than totally candid, it did not constitute a 'material falsehood.'" While he does not elaborate, we take Cusumano to be arguing that his misrepresentation was not "material" because it did not influence the probation officer's report.

We have found no case that has directly held on the question whether materiality under § 3C1.1 is an issue of law or fact for the district court. To the extent courts have spoken to the issue, it appears that there may be some difference of opinion. *Compare, e.g., United States v. Torres-Rodriguez,* 930 F.2d 1375, 1389–90 (9th Cir. 1991) (review district court's finding of obstruction of justice, for false testimony as to material fact, for clear error) *with United-ed States v. Bakhtiari,* 913 F.2d 1053, 1063 (2d Cir.1990) (district court determination of obstruction of justice reviewed as factual finding except where question turns on interpretation of guideline term), *cert. denied,* —— U.S. ——, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991). The parties have not addressed the specific question of our standard of review of a materiality determination by the district court. We will assume without deciding that our standard of review is plenary, because even under this more rigorous standard the district court did not err.

As the term is defined in application note 5, "material" information means "information that, if believed, would tend to influence or affect the issue under determination." Under the Guidelines, a determination of one's ability to pay is a necessary step in the imposition of a fine. *See* U.S.S.G. § 5E1.2. A statement to a probation officer concerning one's financial resources will obviously affect the officer's determination of ability to pay. Therefore, that information is "material" to the officer's recommendations as to fines. We thus conclude that the misrepresentation was "material" within the meaning of application note 3(h), and that an upward adjustment under § 3C1.1 was warranted.

### III. CONCLUSION

The sentence of the district court will be affirmed.