

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-4-2003

# USA v. Cordo

Precedential or Non-Precedential: Precedential

Docket 01-2392

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Cordo" (2003). *2003 Decisions.* Paper 599.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/599

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed April 4, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2392

UNITED STATES OF AMERICA

v.

JOSEPH CORDO,
Appellant

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal No. 00-cr-00046-4)
District Court Judge: Honorable William W. Caldwell

Argued December 16, 2002

Before: NYGAARD, ALITO and RENDELL, *Circuit Judges*

(Filed April 4, 2003)

Peter Goldberger, Esq. [ARGUED]
Law Office of Peter Goldberger
50 Rittenhouse Place
Ardmore, PA 19003-2276
*Counsel for Appellant*

Theodore B. Smith, III, Esq.
 [ARGUED]
Office of U.S. Attorney
Federal Building, Suite 220
228 Walnut Street
P.O. Box 11754
Harrisburg, PA 17108
    *Counsel for Appellee*

---

**OPINION OF THE COURT**

---

RENDELL, *Circuit Judge*:

Joseph Cordo appeals from a judgment of conviction and sentence entered in the District Court on May 22, 2001, following a jury trial for money laundering and related charges connected to his participation in several fraudulent investment schemes. We will affirm Cordo's conviction, but reverse and remand for resentencing.

I.

In the early 1990s, appellant Joseph Cordo, who worked as an insurance salesman, was introduced to Steven Stackpole. Together with Gavin Greene, Stackpole had formed an investment vehicle, Entertainment Architects ("EA"), which was selling an investment program called the "Prime Trust Guarantee." In order to attract investors, Greene and Stackpole had fabricated an EA brochure and various other promotional documents and literature, falsely suggesting that investments in EA would be secured by commercial real estate and other holdings. Cordo eventually began selling EA investments.

In late 1994, Stackpole and Greene incorporated in New Jersey as EA International ("EAI"), and formed EA International Trust ("EAIT"), a wholly owned subsidiary of EAI, with themselves as trustees. This new investment vehicle, EAIT, then opened an account with Maidstone Financial, Inc., a New York investment banking firm. For investors, the new investment program would — at least nominally — include positions in blue chip stocks as well

as the opportunity to participate in IPO's being underwritten by Maidstone. Investors were guaranteed a 12% annual return over five years, and were assured no risk of loss and that their funds were fully insured and IRA-qualified for tax purposes. Further, investors were told that no charges, fees, or commissions would be deducted from their investments.

All of these representations were complete fabrications. The funds were not insured, the plan was not IRA qualified, there was no way of guaranteeing returns, and extensive commissions and fees were deducted from the investments from the outset. Further, EA never disclosed that its sales force, such as Stackpole and Cordo, were not licensed to sell securities, nor that several of the individuals involved, including Stackpole and another co-defendant, Jeffrey Klepper, had been respectively sued for and convicted of fraudulent activities.

Between late 1994 and April 1997, thirty-four individuals invested $1.5 million in the program. Contrary to EA's representations, however, less than one third of that total was ever deposited into the Maidstone investment account, and the only other "investments" made by EA were the purchase of a two-bedroom condominium in New Jersey and a topless dance club in the Bronx, for a total of approximately $140,000.

Separate from the Maidstone investment activity, EA saw a potential market in obtaining better returns for funeral home directors on "pre-need" funds — money they collect as prepayments for funeral services. Stackpole, Klepper, and Cordo were all involved in the exploration and development of the pre-need business, and another company, Commonwealth Partnership Trust ("CPT"), was formed by Klepper and Cordo to handle much of the day-to-day operations of the new venture.

Pennsylvania law requires that pre-need funds be deposited in trust with a Pennsylvania Bank, so, in 1996, EAIT entered into an agreement with Nazareth National Bank whereby Nazareth would accept pre-need funds from funeral homes and immediately deposit them with EAIT for investment. The homes were guaranteed at least 7% in

annual returns, as well as the secondary benefit of having CPT assume the relevant record-keeping obligations. CPT was also responsible for marketing the venture to funeral homes, and for its part EAI agreed to pay CPT 20% of each dollar invested.

Some time in 1996, Cordo significantly reduced his active participation in EAIT's investment operations to assist in the care of his father, who had been diagnosed with cancer. Although not heavily involved in the daily operations of CPT, Cordo was the company's Vice President and was paid as much as 4% of every dollar invested in the program. Throughout this period, Cordo received commission checks for his work with CPT and EAIT. Many of these checks were endorsed over to his mother, who would cash them or, occasionally, deposit them into her own account. Further, Cordo would sometimes receive between two and four checks written by EAI on the same day, each with an amount less than $10,000 but together totaling over that amount. On one occasion, a payment of over $72,000 was paid by way of two checks totaling just over $7000, with the balance deposited into a CPT money market account. Cordo then opened a new checking account in CPT's name, wrote a check from the first account to the second, and then used most of the money in the new account for personal expenses. Also, from July 25, 1997, through August 19, 1998, thirteen checks were written directly from CPT to pay off a loan that Klepper had taken out on behalf of Cordo for the purchase of a boat.

Things began unraveling for EAIT in late 1997. Nazareth was served with a subpoena requesting all documents relating to its dealings with EAIT, and learned that Stackpole had been indicted for the misappropriation of $1.4 million of investments in the late 1980s and early 1990s, prior to the creation of EA. As a result, Nazareth immediately demanded an accounting, and subsequently discovered that less than half of its $5 million had been deposited into the Maidstone account.

After forcing Stackpole's resignation, Nazareth attempted to cover the death claim liabilities by obtaining one year term life insurance policies on the lives of the funeral homes' pre-need customers. On February 28, 1998, EAIT's

Maidstone account, which by that time was worth only $440,000, was liquidated. EAIT's Park Avenue offices were abandoned in March, and in May Greene reported to Klepper and Cordo that EA had absolutely no remaining assets.

Nonetheless, the ventures continued to represent to investors that they remained in business. CPT sent account statements to its funeral home customers through June of 1998, statements that inexplicably reflected automatic increases in the EAIT accounts and no accounting for EAIT's extraordinary losses. In July 1998, in a phone conversation recorded by law enforcement personnel, Klepper represented to an investor that EAIT was still in business and assured him that his investments were safe. In September 1998, Greene, Klepper, and Stackpole sent a letter to EAIT's individual investors stating that EAIT's offices had moved from Park Avenue to an office suite in New Jersey, a "suite" that was in fact a Mail Boxes Etc. maildrop. Further, the four individual investors who had chosen to receive monthly interest checks continued to receive their disbursements through July of 1998, at which point EAIT was completely insolvent. Klepper then forwarded funds from CPT to an EAIT checking account, and two of the four investors continued to receive monthly checks through that October. Finally, a refund check to one investor who sought the return of his $7,000 investment was sent from EAIT after Cordo personally wired the money to the EAIT account.

Ultimately, the losses from the various schemes totaled approximately $5.9 million. A grand jury returned a 58 count indictment against Stackpole, Klepper, and Cordo. Cordo specifically was charged with: (1) one count of conspiracy to commit mail fraud, involving eleven mailings made between November 1994 and December 1998 in execution of a scheme and artifice to defraud individuals and funeral homes with a series of affirmative misrepresentations and omissions of material fact; (2) one count of conspiracy to commit money laundering by conducting financial transactions with the proceeds of criminal activity; and (3) thirteen substantive counts of money laundering, all relating to the payments made from

CPT to pay off the loan taken out by Klepper for Cordo's purchase of the boat.

The jury returned a verdict convicting Stackpole and Klepper of various charges of mail fraud, money laundering, and related offenses, and convicting Cordo on all the charges against him.[1] Cordo submitted a sentencing memorandum arguing that the counts against him should be grouped under U.S.S.G. § 3D1.2. The government opposed grouping, arguing that while the mail fraud counts imposed distinct harms on distinct victims, the sole victim of the money laundering was society at large. The District Court agreed. Cordo's offense level was therefore calculated based on two different count groups — the mail fraud conspiracy in one group and the money laundering counts in another. Reflecting the two additional units for the two groups pursuant to U.S.S.G. § 3D1.4, Cordo's total offense level was set at 29, which, given his criminal history category of I, resulted in a sentencing range of 87-108 months. Ultimately, the District Court selected a sentence from the middle of the applicable range, and sentenced Cordo to 96 months imprisonment.[2] Judgment was entered May 22, 2001, and Cordo timely appealed. Bail pending appeal was denied, and Cordo is presently serving his sentence. The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

Cordo's appeal was consolidated with the appeals of his co-defendants Steven Stackpole and Jeffrey Klepper. All three co-defendants argued that: (1) the District Court's jury instructions were plainly erroneous because they suggested that conviction for conspiracy to commit mail

---

1. Cordo was also charged by indictment with one count of money laundering forfeiture, and entered a conditional guilty plea to that count after the jury returned a verdict against him on the principal offenses.

2. Notably, Cordo was further sentenced to forfeit his interest in certain property, to pay a special assessment of $1500, and — jointly and severally with his co-defendants — to pay over $1.2 million in restitution.

fraud could be partly based on material omissions, and (2) the District Court's jury instruction on the liability of co-conspirators pursuant to *Pinkerton v. United States*, 328 U.S. 640 (1946), violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000). We find these arguments to lack merit.[3]

Cordo has argued separately that the government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose material information about the activities of Marshall Bernstein, the CEO and Chairman of Maidstone Financial, the investment bank used by EAIT, who was indicted for and later pled guilty to various charges of money laundering and securities fraud five months after Cordo was convicted. We note initially that Cordo raises this issue for the first time on appeal, and that generally it is "inappropriate to resolve a *Brady* claim in the first instance." *United States v. Ferri*, 778 F.2d 985, 997 (3d Cir. 1985); *see also United States v. Dansker*, 537 F.2d 40, 65 (3d Cir. 1976). However, we have examined the merits of this argument and conclude there was no *Brady* violation because Cordo has shown neither that the government failed to disclose material within its possession nor the reasonable probability that the material could have changed the outcome at trial.[4]

The primary issue we consider in this appeal is whether Cordo's mail fraud and money laundering convictions should have been grouped under § 3D1.2 of the Sentencing Guidelines. The circumstances under which money laundering charges should be grouped with charges for other related conduct is an issue that is frequently confronted by the district courts, but has been only rarely addressed by our court.

---

3. Our analysis of these issues is set forth in a separate, non-precedential opinion issued in the cases of Stackpole and Klepper. *See United States v. Stackpole*, No. 01-2033 (3d Cir. 2002).

4. Cordo also argues that there was an *Apprendi* violation because the indictment omits "factual averments of the requirements for *Pinkerton* liability" with regard to certain of the charges in the indictment. However, Cordo cites no legal authority or plausible factual basis for his argument, and we are unable to discern any potentially arguable violation of *Apprendi*.

A.

Section 3D1.2 of the Sentencing Guidelines provides that "all counts involving substantially the same harm shall be grouped" for sentencing purposes. At issue here is subsection (b) of that guideline, which provides that counts involve substantially the same harm when they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." U.S.S.G. § 3D1.2(b).[5]

The guideline commentary supplies further guidance in the proper application of this provision. First, Application Note 2 relevantly states:

> The term "victim" is not intended to include indirect or secondary victims. Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim. For offenses in which there are no identifiable victims (*e.g.*, drug or immigration offenses, where society at large is the victim), the "victim" for purposes of subsections (a) and (b) is the societal interest that is harmed. In such cases, the counts are grouped together when the societal interests that are harmed are closely related. . . . Ambiguities should be resolved in accordance with the purpose of this section as stated in the lead

5. Noting that courts had split on the question, the Sentencing Commission recently amended the relevant guidelines to explicitly require that mail fraud and money laundering charges such as those at issue here be grouped for sentencing. *See* U.S. Sentencing Guidelines Manual app. C, amend. 634 (2002). Although the amendment is not directly relevant to our discussion, it is notable that in reiterating that its amendment resolved the split, the Commission cited favorably to our decision in *United States v. Cusumano*, 943 F.2d 305 (3d Cir. 1991), as well as to the Fifth Circuit's decision in *United States. v. Leonard*, 61 F.3d 1181 (5th Cir. 1995), and the Seventh Circuit's decision in *United States v. Wilson*, 98 F.3d 281 (7th Cir. 1996), each of which, as we explain below, support the decision we reach today. Because Cordo is not eligible for the retroactive application of these amendments, however, *see United States v. Edwards*, 309 F.3d 110, 112 (3d Cir. 2002), our analysis is limited to the provisions of the Guidelines in place at the time of Cordo's sentencing. Accordingly, references throughout are to the November 1, 2000 Guidelines Manual.

> paragraph, *i.e.,* to identify and group "counts involving substantially the same harm."

U.S. Sentencing Guidelines Manual § 3D1.2, cmt. 2 (2000). Continuing that general theme, Application Note 4 states:

> Subsection (b) provides that counts that are part of a single course of conduct with a single criminal objective and represent essentially one composite harm to the same victim are to be grouped together, even if they constitute legally distinct offenses occurring at different times.

*Id.* at cmt. 4.

Relying on these Application Notes, and subsection (b) itself, Cordo persuasively argues that the District Court erred in refusing to group his mail fraud and money laundering charges. Cordo urges that the individual investors and funeral homes were the identifiable victims of both his acts of fraud and his acts of money laundering. Accordingly, he argues that his conduct involved "the same victim[s] and two or more acts or transactions connected by a common criminal objective [and] constituting part of a common scheme or plan," and thus should have been grouped under the guidelines. U.S.S.G. § 3D1.2(b).

The issue of grouping matters here; if the charges had been grouped, Cordo would not have received a two level increase in offense level under § 3D1.4. Cordo's base level would therefore have been lowered to 27 from 29, resulting in a sentencing range of 70-87 months instead of 87-108 months. Accordingly, Cordo's sentence of 96 months would have been reduced by at least nine, and up to sixteen, months.

The government asserts, in contrast, that there *were* different victims involved here. Whereas the mail fraud offenses obviously took as their victim the investors themselves, the government argues, the money laundering offenses effected only a societal harm. The District Court's brief discussion of the issue suggests that it viewed the analysis similarly:

> "Insofar as the grouping is concerned, I think the guidelines are looking at the same harms and the same

> victims in determining whether there should be a grouping or not. Here in my mind, we have separate harms and separate victims, and I think that has been well argued by counsel in their presentations. We will not group the two offenses of fraud and money laundering."

We review the District Court's determinations of factual questions relating to sentencing under the clearly erroneous standard, but the "construction of § 3D1.2 is a legal issue for our plenary review." *United States v. Cusumano*, 943 F.2d 305, 313 (3d Cir. 1991); *see also, e.g.*, *United States v. Rudolph*, 137 F.3d 173, 178 (3d Cir. 1998). We will reverse on this issue, and will accordingly remand for resentencing.

B.

Our only precedent directly applicable to the question before us is our decision in *United States v. Cusumano*, 943 F.2d 305 (3d Cir. 1991). *Cusumano* involved a kickback scheme concerning an employee benefit plan, for which the defendant was convicted on a number of counts of conspiracy, embezzlement from an employee benefit plan, receipt of kickbacks relating to an employee benefit plan, laundering the proceeds of unlawful activity, and foreign travel in aid of racketeering. *Id.* at 307-08. Stating that "the money laundering . . . is very much in the thick of th[e] entire scheme," the district court rejected the defendant's argument that the money laundering charges were "ancillary" to the primary kickback offenses, and grouped the charges under subsection (b). *Id.* at 312-13. We noted that although our review of the proper interpretation of § 3D1.2 is plenary, the only question at issue was the "essentially factual" one of the precise role of the money laundering in the scheme. We thus reviewed for clear error, agreed with the district court's determination that the money laundering was not "ancillary" to the scheme and, therefore, held that grouping was appropriate. *Id.* at 313. We stated:

> Even if we were to accept his dubious characterization of the facts, Cusumano's argument does not defeat the application of § 3D1.2(b) to this case. Cusumano was

> convicted under the money laundering statute, 18 U.S.C. § 1956. The issue here under the Guidelines is whether those convictions and his other convictions "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting a part of a common scheme or plan." The victim of all offenses in this case was the Fund and its beneficiaries. The evidence demonstrated that the unlawful kickbacks, the embezzlement, the conspiracy, the travel act violations and the money laundering were all part of one overall scheme to obtain money from the Fund and to convert it to the use of Cusumano [and his co-defendants]. Therefore, the district court's conclusion that the money laundering offenses were not "ancillary" is not clearly erroneous.

*Id.*

Although the specific issue in *Cusumano* was "essentially factual" — i.e., whether or not Cusumano's money laundering conduct was actually "ancillary" to his overall fraudulent scheme — we indicated there that, under § 3D1.2(b), money laundering charges should be grouped with the charges that generated the funds unless the money laundering was somehow a separate operation, distinct from the scheme itself. *Id.* In *Cusumano* we made clear that money laundering offenses do not necessarily have society at large as their victim, and that, at least in some circumstances, money laundering will have an identifiable victim or victims for sentencing purposes. *Id.* And, where the money laundering's identifiable victims are identical to the victims of the related offenses, such as the targets of a fraudulent scheme — the employee benefit fund and its beneficiaries in *Cusumano* — subsection (b) calls for the counts to be grouped.

Until now we have not had direct occasion to reexamine this specific issue further. However, we have consistently referenced the reasoning we employed in *Cusumano*. In *United States v. Smith*, 186 F.3d 290 (3d Cir. 1999), which involved an embezzlement/kickback scheme that operated against one private company, we noted that the district court had grouped the defendants' four charges — conspiracy to defraud, interstate transport of stolen

property, causing interstate transport of stolen property with intent to distribute, and money laundering — under subsection (b). *Id.* at 296-97. Although the issue was not directly before us, we stated that the grouping was "appropriate" because the company "was the 'same victim' and all transactions were connected to the kickback scheme." *Id.* at 297 (citing *Cusumano*, 943 F.2d at 312). Similarly, in *United States v. Diaz*, 245 F.3d 294 (3d Cir. 2001), which concerned a scheme against the Department of Education involving student loan checks, we noted that the District Court had grouped "several counts, including fraud and money laundering." *Id.* at 303. Citing subsection (b) and *Smith*, we stated:

> Under the sentencing guidelines, the District Court must group the counts into a single unit when there are multiple counts all involving substantially the same harm to the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. *The victim in all of Diaz's offenses was the same, the DOE.* All of her acts were part of a common plan.

*Id.* at 300 (emphasis added) (citations omitted); *see also United States v. Omoruyi*, 260 F.3d 291, 298 (3d Cir. 2001) (noting that "several counts, including mail fraud and money laundering, ha[d] been grouped [by the district court] pursuant to U.S.S.G. § 3D1.2(b)").[6]

The reasoning underlying *Cusumano*, *Smith*, and *Diaz* is highly persuasive. Section 3D1.2(b) requires the grouping of

---

6. We also had occasion to examine the "victim" aspect of subsection (b) in *United States v. Rudolph*, 137 F.3d 173 (3d Cir. 1998), a case not involving money laundering. There we held that § 3D1.2(b) did not apply to a situation in which an INS special agent convicted of taking a bribe relating to providing a template to an unauthorized user had also sold a confidential presentence report. *Id.* at 181. We held that while society at large was the victim of the bribe, the individual for which the presentence report was prepared was the victim of the sale. *Id.* Judge Becker, concurring in the result, was of the view that the harm in both instances should be viewed in a less formalistic manner, as the "undermining of the citizenry's trust in government and its officials." *Id.* at 183 (Becker, J., concurring).

money laundering charges with the charges for related offenses if the conduct is all part of one scheme with the same identifiable victims. Where there is a single scheme or artifice to defraud a victim or set of victims — an employee benefits fund and its beneficiaries, a private company, the Department of Education, or a collection of individual investors and funeral homes — that results in charges for money laundering as well as the conduct that generated the subsequently laundered funds, the charges should be grouped for sentencing.

Apparently crediting the arguments of the government, the District Court here held otherwise, holding that the money laundering and mail fraud counts had different victims. Similarly, the government argues that the victims of the mail fraud were the investors and funeral homes, whereas the sole victim of the money laundering was society at large. Under the sentencing guidelines, however, the court is to consider the "victim of the offense for grouping purposes to be "society" only if the offense had "no identifiable victim." U.S. Sentencing Guidelines Manual § 3D1.2, cmt. 2 (2000). The Guidelines cite drug and immigration offenses as examples of such victimless crimes. *Id.*

We cannot agree with the District Court that the money laundering here had no identifiable victim. Certainly there are cases where, for instance, the defendants are charged with laundering funds obtained from drug sales or gambling. But this is not such a case. Here the acts of money laundering and mail fraud were all "in furtherance of a single fraudulent scheme" to defraud identifiable victims — unsuspecting investors and funeral homes. *Id.* at cmt. 4.

The jury found that Cordo, Klepper, and Stackpole were involved in conspiracies to commit mail fraud and money laundering, and that Cordo committed thirteen substantive acts of money laundering in connection with his purchase of the boat. It is undisputed that all of the laundering activity at issue involved funds that were proceeds of the fraudulent investment scheme. The laundering was simply the final step in the operation. In other words, "the evidence demonstrated that" the mail fraud and money laundering

were "part of one overall scheme to obtain money from [the investors] and to convert it to the use of " Cordo and his co-defendants. *Cusumano*, 943 F.2d at 313. Thus, just as in *Cusumano*, *Smith*, and *Diaz*, the acts of money laundering were a further victimization of the defrauded investors, and therefore *did* have identifiable victims. Because this was a "single course of conduct with a single criminal objective," imposing "essentially one composite harm" on the "same victim[s]," the charges should have been grouped. U.S. Sentencing Guidelines Manual § 3D1.2, cmt. 4 (2000); *see also United States v. Wilson*, 98 F.3d 281, 282-83 (7th Cir. 1996); *United States v. Leonard*, 61 F.3d 1181, 1186 (5th Cir. 1995).

The government has offered no persuasive argument that would cause us to conclude otherwise. At oral argument, the government urged that this case was somehow distinguishable from *Cusumano* because the money laundering there had a different purpose and, further, involved a more substantial percentage of the funds obtained through the overall fraudulent scheme. Unlike *Cusumano*, the government argued, the money laundering activities here were meant only to conceal the defrauded funds, and thus did not victimize the defrauded investors but instead represented a distinct course of conduct imposing a wholly separate type of harm.[7] That conclusion simply does not follow. The money laundering here was the completion of a scheme to convert funds fraudulently obtained from those investors. The payments made directly from CPT for Cordo's boat, for instance, were nothing but the final act in the conversion of the funds, by way of the scheme, to Cordo's personal use. Similarly, the fortuitous

---

7. Although the government appeared to abandon the contention at oral argument, in its brief the government attempted to further distinguish *Cusumano* from the present facts by arguing that in that case "the district court and this Court determined that grouping was proper because *society* was the victim of all the offenses and the offenses constituted part of a common scheme or plan." That is quite clearly not the holding of *Cusumano*, which to the contrary explicitly stated that "[t]he victim of all offenses in this case was the Fund and its beneficiaries," and never referenced society as the potential victim. *Cusumano*, 943 F.2d at 313.

fact that Cordo was only charged with laundering *some* of the funds obtained fraudulently does not mean that the money laundering was not an essential aspect of the overall fraudulent scheme. Notwithstanding the government's contentions to the contrary, we are unable to discern any distinction between the type of harm involved here and the type of harm involved in *Cusumano*. In both, there was a common scheme or plan involving multiple acts or transactions against identical victims, as expressly contemplated by § 3D1.2(b) grouping. *See Cusumano*, 943 F.2d at 313.

Our analysis finds support in the grouping decisions of several of our sister Courts of Appeals. In *United States v. Leonard*, 61 F.3d 1181 (5th Cir. 1995), the defendant was convicted on a variety of charges, including money laundering, mail fraud, and wire fraud, relating to a telemarketing scam. *Id.* at 1183. The Court of Appeals for the Fifth Circuit, reviewing the District Court's grouping decision de novo, held that grouping was necessary. *Id.* at 1185-86. The court found that the money laundering activities "perpetuate[d]" the other crimes by "advanc[ing] the mail and wire fraud scheme that victimized nearly 500 people." *Id.* at 1186. The court explicitly endorsed our subsection (b) analysis in *Cusumano*, stating that the situations were similar in that the money laundering involved in both *Cusumano* and *Leonard* was not "ancillary" or "neatly separated" from the other offenses, but was instead part of "a single, integrated scheme." *Id.* Accordingly, the court upheld the District Court's grouping decision.[8]

The same reasoning was adopted by the Seventh Circuit Court of Appeals in *United States v. Wilson*, 98 F.3d 281 (7th Cir. 1996). In *Wilson*, the defendant was a securities broker who "conducted a Ponzi scheme that defrauded forty-eight victims of more than three million dollars." *Id.* at

---

8. Although the Fifth Circuit's analysis seems most relevant to subsection (b), and although the Court explicitly "follow[ed]" our subsection (b) analysis in *Cusumano*, the court indicated that it was holding that grouping was necessary under subsection (d). *Leonard*, 61 F.3d at 1185-86; *see also Wilson*, 98 F.3d at 282-83.

282. Like the scheme involved here, while the investors were told that their money was being placed into secure investments, Wilson deposited the funds into a personal account and "used them for both personal expenses and to cover interest and dividend payments owed to previous investors." *Id.* Wilson pled guilty to charges of mail fraud and money laundering, and on appeal argued that the District Court erred in failing to group the charges. *Id.*

The Court of Appeals for the Seventh Circuit agreed, and reversed the District Court's failure to group the charges for purposes of sentencing. *Id.* at 282-84. The court first reiterated that the "central purpose" of the grouping provisions was to " 'combine offenses involving closely related counts.' " *Id.* at 282 (quoting *United States v. Mullens*, 65 F.3d 1560, 1564 (11th Cir. 1995)). The court then noted that "Wilson's convictions for mail fraud and money laundering without question me[t] that criterion," as "[a]ll of the money that Wilson laundered was money defrauded from his investors." *Id.* at 282. Thus, the court "reject[ed] the government's contention that these offenses [we]re inappropriate for grouping because they involve[d] different victims and thus different harms." *Id.* at 283. Although the court indicated that it may agree that "[i]n the abstract" the "victim of mail fraud is the person defrauded, while the victim of money laundering is society at large," the court stated:

> [W]hen the defendant is convicted of laundering the proceeds of his fraud in order to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds, . . . there is intuitive force to the argument that the victim of the fraud is also a victim of the transaction designed to hide or "cleanse" the funds of which she was defrauded. More to the point, the money laundering in this case served to perpetuate the very scheme that produced the laundered funds.

*Id.* (quotations omitted); *see also United States v. Rudolph*, 137 F.3d 173, 184 (3d Cir. 1998) (Becker, J., concurring) (praising the Seventh Circuit's approach in *Wilson*). The Court then quoted at length from *Leonard*, noted that decision's reliance on our opinion in *Cusumano*, and, like

*Leonard*, held that grouping was required under subsection (d). *Id.* at 283-84.

### III.

Cordo's acts of mail fraud and money laundering were part of a common scheme involving identical victims — defrauded investors. We therefore agree with Cordo that the District Court erred in failing to group his mail fraud and money laundering counts pursuant to § 3D1.2(b), resulting in an incorrect base offense level and sentence.

Accordingly, we will REVERSE the District Court's order, and REMAND for a new sentencing consistent with this opinion.

A True Copy:
        Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*