UNITED STATES of America

v.

Dean Martin ARNOLD.

Criminal No. 95–153.

United States District Court, E.D. Pennsylvania.

Nov. 24, 1997.

Michael Schwartz, Asst. U.S. Atty., Philadelphia, PA, for U.S.

Jeffrey M. Lindy, Philadelphia, PA, for defendant.

### OPINION AND ORDER

VAN ANTWERPEN, District Judge.

## I. INTRODUCTION

This matter is before us for resentencing following a hearing in open court on November 12, 1997. Two years ago, in a trial extending from November 7, 1995 through November 14, 1995, Dean Martin Arnold was convicted by a jury of two counts of bank

larceny (18 U.S.C. § 2113(b)), two counts of money laundering (18 U.S.C. § 1956(a)(1)(B)(i)), one count of witness tampering (18 U.S.C. § 1512(b)(3)), and one count of attempted killing of a witness (18 U.S.C. § 1512(a)(1)(A)). On February 22, 1996, Defendant was sentenced to 210 months in prison and ordered to pay restitution. On February 4, 1997, the United States Court of Appeals for the Third Circuit reversed the conviction for attempted killing of a witness, vacated the sentence of 210 months, vacated the Restitution Order, and remanded the matter to this court for resentencing on the remaining five counts and recalculation of the Restitution Order. *United States v. Arnold*, 106 F.3d 37 (3d Cir.1997) (*"Arnold"*).

## II. BACKGROUND

Between November 1992 and June 1995, Defendant was employed by Federal Armored Express ("Federal Armored") as an armored car driver and courier. Defendant has admitted that on December 29, 1993, he stole $65,000 from a pouch he was transporting for his employer. Trial Transcript of 11/8/95 ("Tr. 11/8/95") at 127. On May 31, 1994, he took an additional $15,000, and on August 23, 1994, he took $400,000 in cash from the main vault at Federal Armored. Defendant admitted to these thefts as well. *Id.* at 129. In all, Defendant stole nearly half-a-million dollars from his employer over a period of approximately eight months.

Defendant drew on the stolen funds to make a down payment on a trailer home, buy furniture, purchase cameras and accessories, hire a bodyguard, purchase firearms, pay tuition at a private investigator school, and make several other purchases documented by the Government at trial.

Defendant lived with and was engaged to Jennifer Kloss from March 1994 until November 1994, at which time the engagement was terminated. Kloss moved out and spoke to FBI agents about Defendant's activities. After each of the thefts, Defendant showed Kloss the stolen money. Shortly after telling Kloss of his involvement in the thefts, Defendant began threatening to kill her if she reported him to the FBI. On one occasion,

Kloss testified, Defendant choked her and placed a gun to her head, telling her how easy it would be to kill her. Trial Transcript of 11/7/95 ("Tr. 11/7/95") at 37. There was additional testimony that Defendant later set aside over $20,000 to hire a hit man to kill Kloss. *Id.* at 111.

On August 23, 1994, the FBI visited the trailer home where the Defendant and Kloss were living, in connection with an investigation into the money stolen from Federal Armored. On August 25, 1994, Defendant went with Kloss and her father to visit an attorney, Richard Makoul, Esq. Mr. Makoul consulted with Kloss and Defendant privately, and accepted a $1,000 retainer. In December 1994, Kloss voluntarily provided the FBI with information about Defendant's thefts. On March 28, 1995, a federal grand jury returned a sealed five count indictment charging Defendant with bank larceny, money laundering, and witness intimidation. Later that day, Defendant met with an undercover police officer who was posing as a professional hit man. Defendant gave the officer over $10,000 as a down payment for having Kloss murdered. As Defendant left this meeting, he was arrested by the FBI. A superseding indictment was issued on April 11, 1995, incorporating the five counts of the original indictment and adding one count of attempted killing of a witness.

Prior to the commencement of trial, the Government moved to disqualify Mr. Makoul as Defendant's counsel on the basis of his prior representation of Kloss. On May 4, 1995, after hearing arguments on the issue, we granted the Government's motion. *United States v. Arnold*, 913 F.Supp. 348 (E.D.Pa. 1995). Defendant subsequently petitioned the Court to appoint counsel to represent him. A hearing on Defendant's request was held on July 12, 1995, at which time Defendant testified that he had no property, cash, securities, or other valuables, and could not afford to hire an attorney. Motion Hearing of 7/12/95 ("Tr. 7/12/95") at 4–5. At the conclusion of this hearing, Defendant consented to the appointment of Edson Bostic, of the Federal Defender Association, as his attorney. *Id.* at 6.

Although Defendant admitted committing the three thefts, he insisted on pleading not guilty to all counts of the indictment. Trial began on November 7, 1995. The evidence presented at trial established that Defendant's actions were willful, deliberate and premeditated, that Defendant completed all of the acts he believed to be necessary to kill Kloss, and that Defendant had failed to account for over $129,000 of the money he had stolen. On November 14, 1995 the jury convicted Defendant on all counts of the indictment.

On appeal, the United States Court of Appeals for the Third Circuit held that the meeting between Defendant and the undercover police officer posing as a hit man violated Defendant's Sixth Amendment right to counsel since Defendant had been indicted earlier that day. *Arnold,* 106 F.3d at 40. The Court of Appeals reversed the conviction for attempted killing of a witness, vacated the sentence of 210 months, and ordered additional sentencing proceedings on the remaining five counts.

Resentencing was initially scheduled for August 20, 1997. Memoranda were filed by the Federal Defender Association and the U.S. Attorney's Office, and a revised Presentence Investigation Report ("Presentence Report") was prepared by a United States Probation Officer. Defendant also sent a letter to the court in which he claimed that his attorney had lost the case on purpose and was collaborating with the U.S. Attorney's Office regarding the resentencing hearing.

At the August resentencing hearing Defendant expressed dissatisfaction with his attorney and requested that a new attorney be appointed—one not affiliated with the Federal Defender Association. Sentencing Transcript of 8/20/97 ("Tr. 8/20/97") at 8. We granted Defendant's request and continued the sentencing hearing so that a new attorney could be appointed. *Id.* at 15. A new attorney was appointed, however, he was subsequently removed due to a conflict of interest. A new sentencing hearing was scheduled for November 12, 1997, and on

September 19, 1997, this court appointed Defendant's current attorney, Jeffrey M. Lindy, Esq.

On October 17, 1997, Mr. Lindy informed the court that the Defendant now desired to discharge him and proceed *pro se* during the remainder of the sentencing proceedings. Defendant's decision to represent himself grew out of his wish to call numerous witnesses and take certain strategic positions at the resentencing hearing. Like Defendant's prior counsel, Mr. Lindy advised Defendant that he thought it unwise to conduct resentencing litigation in the manner Defendant desired, and that he was unwilling to do so. Defendant requested that Mr. Lindy be appointed standby counsel, in order to assist Defendant with procedural matters. On October 20, 1997, we held a hearing to consider Defendant's request. At this time, we undertook the task of ensuring that Defendant's waiver of counsel was intelligently and competently made, as required by the Third Circuit. *See United States v. Welty,* 674 F.2d 185 (3d Cir.1982). Defendant was made aware of the "many dangers in not having a lawyer" in proceedings as complex as sentencing under the federal guidelines. Motion Hearing Transcript of 10/20/97 ("Tr. 10/20/97") at 12. Once this court was satisfied that Defendant understood the risk of foregoing representation, Defendant requested and was granted a recess to contemplate his decision, whereupon he expressed his desire to keep Mr. Lindy as his lawyer. *Id.* at 16–18. We granted his request, and Defendant was represented by Mr. Lindy during resentencing proceedings on November 12, 1997. We gave a full opportunity to both the Government and defense to present evidence, call witnesses, and comment on the Presentence Report. Both the Government and defense elected to rely on the existing record,[1] which they supplemented with certain stipulations. Both sides presented extensive oral argument.

The Court of Appeals' opinion vacating our previous sentence and arguments raised by the parties in writing and at the resentencing

---

1. We received into evidence certain certificates of accomplishment which the Defendant had earned during his incarceration.

proceedings have raised four issues for our consideration. The first concerns the probation officer's recommendation not to group the bank larceny and money laundering counts for purposes of determining the appropriate Offense Level. The second has to do with the Government's motion for a two level obstruction of justice enhancement based on Defendant's false testimony and accusations against the government. The third issue relates to the Government's upward departure recommendations based on Defendant's failure to return all of the stolen money and attempt to purchase Kloss's murder. The fourth issue to be dealt with concerns Defendant's ability to pay restitution and the appropriate amount and timing of any restitution to be imposed. In addition, the defense has filed numerous objections to the Presentence Report. Some of these objections relate directly to the four issues we have just identified. Others warrant individual treatment. We will discuss each of these issues in turn.

## III. DISCUSSION

### A. Grouping the Bank Larceny and Money Laundering Counts

According to the guidelines published by the United States Sentencing Commission ("Sentencing Guidelines"), when a defendant has been found guilty of multiple offenses, the court shall first determine whether any of the offenses should be grouped together as "closely-related counts." Sentencing Guidelines § 3D1.2. The Presentence Report prepared by the Probation Office divides the five counts against the Defendant into two groups. The first group ("Group One") consists of Counts One, Two (both bank larceny) and Five (witness intimidation), and the second group ("Group Two") combines Counts Three and Four (money laundering).[2] There

is no dispute about whether any of the individual counts within these two groups have been properly placed together. Rather, Defendant contends that the Presentence Report should have gone a step further and lumped all five counts into a single group.

### 1. Import of the Grouping Decision

Several sections of the Sentencing Guidelines come into play when computing the appropriate level of Defendant's offenses for sentencing purposes. Section 3D1.3(a) provides that when counts have been grouped together pursuant to § 3D1.2(a)–(c), the offense level applicable to that group is the highest offense level of any of the counts within the group. Section 3D1.4 provides that when counts of which a defendant has been convicted are divided into more than one group, the combined offense level is to be determined by taking the highest level of any single group, and then increasing that level based on the number of groups above a threshold offense level.

Applying these provisions, the Presentence Report assigns an offense level of 20 for Group One (Counts One, Two, and Five), and an offense level of 20 for Group Two (Counts Three and Four). Taking the Offense Level of 20, and applying § 3D1.4 yields a final offense level of 22, which carries a sentencing range of 41 to 51 months imprisonment. The Presentence Report also applied a two level enhancement under § 3C1.1, which we will discuss below in Section III(B).

In contrast to the approach suggested by the Presentence Report, Defendant argues that all five counts should have been combined into a single group. This group would still yield an offense level of 20, but since only one group would exist, there would be no adjustment under § 3D1.4. The final offense level according to Defendant's position

2. Counts One and Two (bank larceny) have been combined in Group One according to § 3D1.2(b), which provides that "when counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan," the counts are to be combined in a single group. Counts Three and Four (money laundering) were combined in Group Two under the same provision. Count Five (witness tampering)

was added to Group One in accordance with Application Note 6 of § 3C1.1, which states that where a defendant is convicted of an obstruction offense under § 2J1.2 (in this case, Count Five was such an offense), "the count for the obstruction offense will be grouped with the count for the underlying offense." Accordingly, Count Five was grouped with Counts One and Two in the Presentence Report.

would thus remain 20, yielding a recommended sentence of 33 to 41 months. There are three Sentencing Guideline provisions under which the money laundering counts might arguably be grouped with the other counts. We will consider each provision in turn.

### 2. Section 3D1.2(b)

■ Section 3D1.2(b) provides that counts should be grouped when they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." Defendant argues that the money laundering represents a continuation of the bank larceny offense—an attempt to hide the proceeds in an overall effort to obtain, use and keep the stolen proceeds. We reject this argument.

The Defendant's offenses did not involve the same victim as required by § 3D1.2(b). The "victim" of an offense is the "one person who is directly and most seriously affected by the offense." § 3D1.2, Application Note 2. The primary victims of the bank robbery charges were Defendant's former employer, Federal Armored, and it's insurance company, W.H. McGee Insurance, Co. ("McGee Insurance"). In contrast, the primary victim of the money laundering counts was society in general. *See United States v. Cruz*, 106 F.3d 1134, 1136 (3d Cir.1997); *United States v. Gallo*, 927 F.2d 815, 824 (5th Cir.1991); Sentencing Hearing Transcript of 11/12/97 ("Tr. 11/12/97") at 74. Therefore, Defendant does not satisfy the threshold requirement of § 3D1.2(b), which states that offenses must typically involve the same victim in order to be grouped under the Sentencing Guidelines.

Defense counsel correctly argued at the November 12, 1997 sentencing hearing that counts need not always involve the same victim in order to be grouped. *See United States v. Wilson*, 98 F.3d 281, 283 (7th Cir. 1996). We note, however, that the *Wilson* Court chose to group money laundering and fraud counts because the money laundering took place "in order to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds." *Id.* There is no indication that the Defendant in

the instant case had any such motive, or that the larceny and the money laundering were elements of a common scheme. The two money laundering counts arise out of the conversion of stolen money into separate bank accounts from which checks were drawn to make a down payment on a trailer home. However, most of the money stolen by Defendant was taken after the money laundering conduct had already occurred. In addition, the majority of the stolen money spent by Defendant and his then fiancee went to unrelated purchases. Of the $480,-000 Defendant admitted taking, only $20,000, roughly 4.1% was spent on the trailer home. The timing of the relevant conduct and the fact that such a small percentage of the stolen funds are involved in the money laundering counts convince us that the bank larceny and the money laundering were not part of a common scheme or plan. In the absence of any such unifying element, we will not overlook the requirement of § 3D1.2(b) that counts generally must involve the same victim in order to be grouped together.

Even the *Wilson* Court stated that "whether the offenses involve different victims is, as the background commentary notes, a primary consideration in the grouping decision." *Id.* (internal quotation omitted). The fact that the bank larceny and money laundering offenses involved different victims therefore remains a strong indication that they should not be combined into a single group for the purposes of sentencing.

Defendant also relies on *United States v. Cusumano*, 943 F.2d 305 (3d Cir.1991), *cert. denied*, 502 U.S. 1036, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992), in which the Third Circuit upheld the district court's decision to group money laundering with other counts in an indictment under § 3D1.2(b). However, it is important to note the *Cusumano* Court's finding that "the victim of **all offenses** in this case was the Fund and its beneficiaries," and that "the evidence demonstrated that the unlawful kickbacks, the embezzlement, the conspiracy, the travel act violations and the money laundering were all part of **one overall scheme** to obtain money from the Fund and convert it to the use of [the defendants]."

*Cusumano,* 943 F.2d at 313 (emphasis supplied).

As we have already stated, the bank larceny and money laundering counts in the instant case involved different victims. In addition, the two groups of charges also involved different conduct and were not part of a common scheme or plan. While it is clear that the money involved in the money laundering counts came from the funds involved in the bank larceny charges, Defendant has failed to show that the money laundering was anything but ancillary to the thefts. We are aware that Defendant testified on direct examination as follows:

> Q. Did the fact that Jennifer told you she wanted to be out of the house play any role in your taking the $65,000?
>
> A. Yes, it was the only reason.

Tr. 11/8/95 at 127. However, Defendant directly contradicted this testimony at his original sentencing hearing: "There's no way I could say that Jennifer is in any way responsible for that." Sentencing Hearing Transcript of 2/22/96 ("Tr. 2/22/96") at 91. Furthermore, as stated above, at no point has Defendant suggested that the money was taken as part of a premeditated, unified scheme to purchase a trailer home. *See Cusumano,* 943 F.2d at 313. On the contrary, Defendant has indicated that the decision to take money was made on the spur of the moment. "Well, on this day I saw the bag was unsealed and I didn't tell him. I put it on the truck, 'cause I knew exactly what I was gonna do. I was gonna go into that bag and I was gonna steal." Tr. 2/22/96 at 90. Defendant also said,

> There's no way I could say that Jennifer is in any way responsible for that. Dean Arnold decided to drop away from his religion and give up everything he was taught his whole life. I—I'm not gonna say "Dean Arnold," I'm gonna say "I"—decided to steal $65,000 that day.

*Id.* at 91. There is simply no indication that Defendant stole the money in furtherance of any overarching scheme, an essential element of which was purchasing a trailer home for himself and his fiancee.

The *Cusumano* Court found that "money laundering ... is very much in the thick of this entire scheme." 943 F.2d at 312. In contrast, the evidence in this case suggests that Defendant's offenses were independent instances of criminal behavior involving different motives, different victims, different harms, and different conduct. This being the case, we decline to group them into a single count under § 3D1.2(b).

### 3. Section 3D1.2(c)

At Defendant's November 12, 1997 sentencing hearing, defense counsel suggested that Group One and Group Two be grouped under § 3D1.2(c). This section allows counts to be grouped "when one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." Defendant cites Frequently Asked Question ("FAQ") 66, which allows counts to be grouped when the conduct forming the basis of one count is a specific offense characteristic or adjustment in the other count, even when the conduct has not risen to a level warranting application of that offense characteristic. Sentencing Guidelines, App. E at 881–882.

We have reviewed the offense characteristics and relevant adjustments relating to bank larceny (§ 2B1.1), money laundering (§ 2S1.1) and witness intimidation (§ 2J1.2) under the Sentencing Guidelines. Having done so, we are not convinced that the conduct at the foundation of any of these offenses is treated as a specific offense characteristic in, or other adjustment to, any of the other offenses. The nearest we have come to identifying any such commonality stems from the fact that bank larceny and money laundering both involve an adjustment based on the sum of money involved. However, while the offense levels for bank larceny and money laundering are both determined monetarily, the severity of the bank larceny offense is measured by the total loss to the victim, while the severity of the money laundering offense is measured by the value of the funds attempted to be disguised. Thus, there is no inherent connection between the two offenses, and we decline to join Group One and Group Two under § 3D1.2(c).

#### 4. Section 3D1.2(d)

■ Defendant also argues that the bank larceny and money laundering provisions of the Sentencing Guidelines, §§ 2B1.1 and 2S1.1 respectively, are included in a list of offenses which are susceptible to grouping under § 3D1.2(d), and that the plain language of § 3D1.2(d) therefore requires that these offenses be grouped. We disagree. While subsection (d) may provide a list of those offenses which are generally appropriate for grouping, the language of this subsection is precatory, not mandatory. *United States v. Ballard,* 919 F.2d 255, 257 (5th Cir.1990), *cert. denied,* 499 U.S. 954, 111 S.Ct. 1429, 113 L.Ed.2d 481 (1991); *United States v. Egson,* 897 F.2d 353, 354 (8th Cir. 1990); *United States v. Pope,* 871 F.2d 506, 510 n. 4 (5th Cir.1989) (each refusing to group offenses specifically enumerated in § 3D1.2(d)). Any grouping decision requires careful consideration of the facts and circumstances unique to that case.

■ Subsection (d) requires more than similar offense level calculations and ongoing or related criminal behavior; there must be some significant factual link between Defendant's offenses before grouping is appropriate. *United States v. Manuel,* 912 F.2d 204, 206–207 (8th Cir.1990). Having found, in our discussion of § 3D1.2(b), that Defendant's bank larceny and money laundering convictions do not even satisfy the primary requirements of § 3D1.2 that the violations involve "substantially the same harm," or the requirements of § 3D1.2(b) that the violations involve "the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan," we cannot now group these offenses under subsection (d).[3]

For the reasons stated above, we find that the base offense level applicable to Defendant under the Sentencing Guidelines is Level 22. Because Defendant falls into a Criminal History Category of I, Level 22 yields a sentencing range of 51 to 63 months imprisonment. We will premise our consideration of the Government's motions for upward departure on these findings.

Even if we were to accept the defense's argument that the appropriate Guideline Offense Level should be Level 20, it would be our view that this level would be insufficient and would under represent the seriousness of the amount of money stolen in this matter. For this reason, we would be inclined to depart upward two levels to Level 22. *See United States v. Baird,* 109 F.3d 856, 870 (3d Cir.1997) ("However, the Sentencing Commission recognizes that it is difficult to prescribe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision. Therefore, a court may depart from the range if it finds that there exists an aggravating or mitigating circumstance of a kind not adequately taken into consideration ... in formulating the guidelines") (internal quotation omitted); *United States v. Kikumura,* 918 F.2d 1084, 1110 (3d Cir.1990).

#### B. Two Level Enhancement for Obstruction of Justice

The Government claims that Defendant should be subjected to an additional two level upward departure under Sentencing Guidelines § 3C1.1, based on his wilfully false testimony that he never threatened to harm Jennifer Kloss, and his false allegations accusing the FBI of stealing money from him.[4]

---

**3.** Even considering the language of subsection (d) more closely, we find that the base levels for Defendant's offenses are not calculated in a similar way, nor was his behavior ongoing and continuous. Moreover, even if they were ongoing and continuous, such offenses can only be grouped if the offense guidelines specifically provide for upward adjustments in the offense level for repeated behavior. *United States v. Pilgrim Mkt. Corp.,* 944 F.2d 14, 19–20 (1st Cir.1991). There are no such adjustments under §§ 2B1.1 and 2S1.1.

**4.** The Sentencing Guidelines provide that, "Where the defendant is convicted for an offense covered by ... § 2J1.2 (Obstruction of Justice) [Count Five in this case] ... this adjustment is not to be applied to the offense level for that offense except where a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself." § 3C1.1 Application Note 6. However, we note that the conduct underlying Count Five had to do with Defendant's direct threats against Ms. Kloss, while the grounds upon which the Government now seeks a § 3C1.1 enhancement

We will consider the standard of proof applicable to this determination and then apply this standard to the Government's arguments.

### 1. Standard of Proof

■ Section 3C1.1 of the Sentencing Guidelines provides for a two level enhancement "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." The Supreme Court has held that this obstruction includes testimony which encompasses the elements of perjury. *United States v. Dunnigan,* 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). Thus, the enhancement applies in cases where a defendant has given willfully false testimony with respect to material matters designed to substantially effect the outcome of the case. *Id.*

■ The language of § 3C1.1 Application Note 1 originally required that sentencing courts evaluate testimony in the light most favorable to the defendant. The Third Circuit elaborated upon this standard when it ordered resentencing in this case.

> We hold that the Application Note's command to evaluate a defendant's alleged false testimony or statements "in a light most favorable to the defendant," requires the sentencing court to refrain from imposing a § 3C1.1 enhancement unless, in weighing the evidence, **it is clearly convinced that it is more likely than not** that the defendant has been untruthful.

*Arnold,* 106 F.3d at 44 (emphasis supplied). We are uncertain as to how we are to interpret this hybrid standard of proof. On the surface, it appears to require application of a preponderance of the evidence standard. However, reading the Third Circuit's opinion in its entirety, suggests that the court intended to require application of the clear and convincing standard. We base this interpretation on the appellate court's summary paragraph at the end of the section on the obstruction enhancement: "On remand, the district court must use the clear and convincing standard, place the burden of proof upon the government, and support its decision with the findings required by the court in Dunnigan." *Id.*

Our task of divining which standard of proof to apply is made more complex by Sentencing Guidelines Amendment 566, which became effective November 1, 1997. This clarifying amendment deletes a portion of the final sentence of § 3C1.1 Application Note 1, which read "... such testimony or statements should be evaluated in a light most favorable to the defendant" and replaces it with "the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." This clarifying amendment applies retroactively to prior Guidelines under § 1B1.11(b)(2), and seems designed to correct the misapprehension that a § 3C1.1 enhancement be justified by clear and convincing evidence.

This court finds itself in the unenviable position of being caught between conflicting mandates. On the one hand, the Third Circuit seems to require that we apply the clear and convincing standard in determining whether an obstruction of justice enhancement is warranted. *Arnold,* 106 F.3d at 44. On the other hand, the Sentencing Guidelines imply that such determinations need satisfy only the preponderance of the evidence standard. Sentencing Guidelines § 3C1.1 Application Note 1 (1997). We have undertaken to review the Government's arguments under both the clear and convincing and preponder-

have to do with unrelated conduct—Defendant's perjury.

We nevertheless believe that if we were to consider Defendant's threats to Kloss during the investigation as the basis for a § 3C1.1 enhancement for "threatening, intimidating, or otherwise unlawfully influencing a codefendant, witness ..." we would have little difficulty in finding

that a significant further obstruction occurred. Since we have already given an enhancement of two points based upon Defendant's perjury, we believe that Defendant's threatening conduct was sufficiently extreme to warrant an upward departure of six levels. Because we have departed upward for other reasons, we need not make an upward departure for this reason.

ance of the evidence standards, and conclude, fortunately, that either standard yields the same conclusion: the two level enhancement is appropriate in this case. Therefore, we need not determine exactly which standard applies to this particular case.

### 2. Defendant's Testimony that He Never Threatened or Injured Jennifer Kloss

After the thefts, the Defendant admitted to Jennifer Kloss that he took the money, and she witnessed the stolen funds in Defendant's possession.[5] The thefts spurred an investigation and the FBI interviewed the Defendant in February 1994. Tr. 11/7/95 at 96. At Defendant's trial, Jennifer Kloss testified that Defendant injured and threatened to kill her on more than one occasion during the investigation.

Q. After telling you about his involvement in that first theft and the other thefts, did the defendant ever threaten you?

A. Yes, he did.

Q. During these threats, did the defendant ever use a weapon?

A. Yes, he did.

Q. Can you tell me the first time that the defendant threatened you with a weapon what happened?

A. Yes, I can.

Q. Take your time.

A. It was at some point in the spring as we had been fighting in the afternoon and arguing.... And I asked him what was left of it. And I remember him saying that there was 5 or $6,000 left of the money and I asked him where the rest went to. And he wouldn't answer me and he threw me against the wall and he told me that I was to get out of his house and to get out immediately.... And the next

thing I knew I was walking into the back room and I was getting a box and that's when he started to push me around. And I remember landing into the wall and I remember walking into the bathroom and I remember him turning around and I remember him throwing me into the tub and telling me that I wasn't going anywhere and telling me that I would be in jail and telling me that I should shut up and telling me everything. And the next thing I remember I was getting up and I was screaming back at him about how could you do that. And I had injured my back. How could you throw me, how could you hurt me, why do you keep hurting me. And the next thing I know he's choking me and he told me that I was going to shut up. And he's like don't you know, don't you know, don't you know I could kill you so easily, I could kill you just like that. I could kill you and I don't care, I really don't care. And I didn't know what was going to happen next. And then the next thing I remembered was he stopped choking me and he had his gun. And he checked his gun and he told me it was loaded and he put it to my head. And he told me that he could blow my brains away and he wouldn't give a shit and he didn't care if I would die, he just didn't care....

[Witness identifies the weapon after a short recess.]

Q. That's the gun he held to your head?

A. Yes, it was....

Q. Did the defendant ever point another gun at you?

A. Yes, he did.

Q. Can you tell the members of the jury what happened with that gun?

A. It was one time in the fall before I left, it would have been last year, I was in our kitchen and I was washing the dishes

---

**5.** Q. After you showed her the money, what happened?
 A. She was very happy, she took off her clothes and played with the money a little.
 Q. Now, what happened with that money, that $65,000?
 A. I took—we took $20,000 in 20's and she wrapped it in Christmas present paper and stored that in her filing cabinet....

Q. Okay. Now, with regard to the theft of $15,000 and the theft of approximately $450,-000, did Jennifer Kloss have any knowledge about that prior to your taking that money, sir?
 A. Not the 15 but the 400 she did.
Tr. 11/8/95 at 128–129.

and I had my back to him. And I turned around and I saw him aiming a rifle at me.

Q. Would you recognize the rifle?

A. Yes....

[Witness identifies the weapon.]

Tr. 11/7/95 at 35–40.

Corroborating the testimony offered by Ms. Kloss, Defendant's former bodyguard also testified that Defendant threatened Kloss.

Q. Did during the time that you were with the defendant, did you ever hear him make any threats against Jennifer Kloss?

A. Can you rephrase the question to her, or?

Q. Sure, did you ever hear him make threatening remarks about Jennifer Kloss?

A. Yes.

Q. Not to her, but about her?

A. Yes.

Q. What did he say?

A. He said to—when he was talking to me about it that the world will be better off without her. He did threaten to pay someone to have her killed.

*Id.* at 108–109. Additional corroboration was provided by the testimony of a co-worker, Daniel Kline, that the Defendant said he was going to kill Jennifer Kloss. Tr. 11/9/95 at 125.

Finally, a conversation documenting Defendant's attempt to arrange Ms. Kloss's killing was recorded.[6] The transcript of a conversation between Defendant and Alex Introcaso on March 27, 1995 shows that Defendant himself made statements such as: "Um, huh. I gotta tell ya, I mean it it sounds, I think it's the only way out, because, my next five years are gonna be a living hell if I don't do it that way," Transcript of Meeting on 3/27/95 ("Tr. 3/27/95") at 6; "We gotta make sure that we have, ah, alibis though," *Id.* at 85; "Cause I told her, I said if you ever go to the police with this, I'm gonna hafta kill ya. And she said she understood." *Id.* at 89.

The evidence cited above is in direct contradiction to Defendant's testimony at trial.

For example, during direct examination, Defendant testified as follows:

Q. Now, during the period of your relationship, you've heard testimony that from shortly after the two of you got together you were abusive to Jennifer Kloss, did you—

A. That's what she says, yes.

Q. Did you ever beat up Jennifer Kloss?

A. I never hit her, no; I never beat her, I never hit her.

Q. Did you ever threaten to harm her in any way?

A. No, I did not.

Tr. 11/8/95 at 139. In addition, Defendant said the following, under oath, during cross-examination:

Q. Did you ever tell Jennifer Kloss words to the effect that if you ever go to the police, I'm going to have to kill you?

A. No.

Q. Never?

A. I never threatened to kill her, no.

*Id.* at 178. Defendant also testified on cross-examination:

Q. In the spring of '94, after the first theft, you pointed this loaded gun at Jennifer Kloss' head, correct?

A. Incorrect.

Q. Did you load this gun in front of Jennifer Kloss?

A. She saw me load it in the morning, when I got ready for work every morning.

Q. Did you ever point this gun at Jennifer Kloss?

A. No, I did not.

*Id.* at 185.

The jury considered the testimony and evidence recounted above, along with other evidence in the case, and convicted Defendant of witness intimidation and attempted killing of a witness. Although the Third Circuit subsequently vacated the attempted killing of a witness conviction, we find that the Government has met its burden of proof for a § 3C1.1 enhancement by presenting the evidence referred to above in its Resentencing

6. We note that this conversation took place the day before Defendant was indicted.

Memorandum and Motion for Upward Departure.

After reviewing all of the evidence and testimony presented at trial, we find that, even under the clear and convincing standard, Defendant has given willfully false testimony with respect to material matters designed to substantially affect the outcome of the case. Given the numerous witnesses who contradicted Defendant and Defendant's own recorded statements, we conclude that Defendant's testimony at trial could not have been the result of "confusion, mistake, or faulty memory." *See Dunnigan*, 507 U.S. at 95, 113 S.Ct. at 1117.

Additionally, we find that the willfully false testimony was sufficiently far reaching to impose additional burdens of proof or investigation upon the government.

We recognize Defendant's constitutionally protected right to testify in his own behalf. However, the Supreme Court has held that imposition of an enhanced sentence under § 3C1.1 does not undermine a defendant's right to testify, for "a defendant's right to testify does not include a right to commit perjury." *Dunnigan*, 507 U.S. at 96, 113 S.Ct. at 1117.

The Supreme Court has commented on the reasons for allowing a sentencing court to impose a § 3C1.1 obstruction of justice enhancement:

> It is rational for a sentencing authority to conclude that a defendant who commits a crime and then perjures herself in an unlawful attempt to avoid responsibility is more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process. The perjuring defendant's willingness to frustrate judicial proceedings to avoid criminal liability suggests that the need for incapacitation and retribution is heightened as compared with the defendant charged with the same crime who allows judicial proceedings to progress without resorting to perjury.

*Dunnigan*, 507 U.S. at 97–98, 113 S.Ct. at 1118.

We have considered the evidence of Defendant's willful commission of perjury in light of the standard enunciated by the Supreme Court in *Dunnigan*, and we feel that a two point enhancement under § 3C1.1 is warranted in this case. Accordingly, we will increase Defendant's Offense Level by two levels, bringing the applicable Offense Level to 24. Having augmented the level of Defendant's offense based upon his perjurious testimony regarding his abuse of and threats against Jennifer Kloss, we need not consider any other grounds for this enhancement.[7]

## C. Government's Upward Departure Recommendations

The Government has requested an upward departure in this case based upon Defendant's failure to return all of the money he stole and his attempt to purchase the murder of a witness. We will place the burden of proof on the Government to establish a basis for these departures by clear and convincing evidence, and consider these proffered grounds in turn.

### 1. Failure to Return a Portion of the Stolen Money

■ The Government has consistently argued that we should depart upward in Defendant's sentence because Defendant has not accounted for all of the money he stole. At Defendant's original sentencing hearing, we made the following finding:

> I will make a—finding at this time that—with regard to Objection # 2, that the Government's figures are correct, however, I believe that they must be modified—as set forth in the Pre–Sentence Report. I will accept that there is—approximately $13,-500 additional that was spent—on clothing. And—I will note that—at this point in time that there appears to me based upon that—that you can say **with certainty**

7. Defendant claimed that the FBI stole money from him and also claimed that the reason he hired a hit man to kill Jennifer Kloss was because Introcaso was communicating with him in sign language, indicating that he would be killed if he did not hire the hit man to kill Jennifer Kloss. We believe that either of these grounds standing alone would be sufficient to separately support an enhancement under § 3C1.1.

**that a substantial amount of money is still missing.** The exact amount of that money cannot be fixed with certainty, but **it appears to the Court that—the amount would be in excess of—$80,000, and that it would not be more—than $100,000.**

Tr. 2/22/96 at 55–56 (emphasis supplied). We based this finding upon several facts. First, the FBI presented a chart at trial showing the expenditures made by and cash recovered from Defendant. This chart accounts for approximately $126,000 of the stolen funds. Second, at trial, Defendant reluctantly revealed the whereabouts of an additional $211,000. Third, Defendant asserts that another $40,000 went to his bodyguard and former fiancee, Jennifer Kloss. Although Defendant has presented no evidence to support these figures, we will take them into account when determining the amount of money still missing. Even assuming that Defendant spent an additional sum on clothing, between $80,000 and $100,000 remains unaccounted for. Therefore, we reaffirm our finding that Defendant has failed to account for between $80,000 and $100,000.

The defendant in *United States v. Hunt,* 756 F.Supp. 217 (E.D.Pa.1990), *aff'd,* 925 F.2d 420 (3d Cir.1991), was a security guard for an armored car company who stole approximately $650,000 from his employer while on the job. In *Hunt,* this court imposed an upward departure of ten levels since the Offense Level otherwise would "not fully capture the harmfulness and seriousness of the conduct of this defendant in refusing to allow the court to account for the missing property as well as preventing the defendant from profiting from his criminal conduct". *Id.* at 222.

We have placed upon the Government the burden of establishing that money is still missing. The Government has met this burden by presenting a detailed reconstruction of Defendant's spending and of money recovered by the FBI. Defendant has failed to offer any specific evidence to rebut these findings. In fact, Defendant has adopted an uncooperative, evasive attitude regarding the stolen money throughout these proceedings.

For example, on July 12, 1995, Defendant testified under oath that he had no property, cash, or valuables, and could not afford an attorney. Tr. 7/12/95 at 3–4. His later testimony showed this to be a lie.

Q. Mr. Arnold, you understand you're under oath now?

A. Yes.

Q. Can you please tell the jury where the FBI can find this missing money right now?

A. My lawyer will take care of that when it's all—at the end.

Q. Where is the missing money?

A. I've been advised by counsel that they will speak to you after the trial.

THE COURT: That what, sir?

THE WITNESS: That they will take care of that.

THE COURT: Well, you have to answer the question and I'm going to order you to answer the question.

THE WITNESS: I was informed by counsel that they were going to take care of that at the end of the trial.

Q. Mr. Arnold, do you know where the money is?

THE COURT: I'm going to order you to answer the question, sir.

Q. Do you know where the money is?

A. Yes.

Q. Where is it?

A. It's in an outhouse.

Q. Where is that outhouse?

A. Behind my parents' house.

Tr. 11/8/95 at 168–169.

Given Defendant's less than candid response regarding the missing funds at trial, the fact that he lied about not having any of the stolen money on July 12, 1995, and his current failure to account for $80,000 to $100,000 of the money he stole, we feel that an Offense Level of 24 would not fully capture the seriousness of Defendant's conduct. Defendant has hindered the Government's efforts to account for all of the missing money, and he stands to profit from his criminal conduct. We will impose a six level upward departure based upon his failure to return or

account for all of the money he has stolen. We are aware that a ten level departure was imposed in *Hunt*, however, we have imposed a lesser departure because, after we ordered him to do so, the Defendant did admit to the location of some of the funds in this case.

### 2. Attempt to Purchase Murder of a Witness

██ The Government also seeks an upward departure based on Defendant's plans to have Jennifer Kloss killed. The Government argues that we can consider a taped conversation between Defendant and a police officer posing as a hit man, even though the conversation took place after Defendant had been indicted. In the alternative, the Government argues that enough pre-indictment evidence exists to support an upward departure independent of the post-indictment conversation. In response, Defendant argues that the evidence obtained after the indictment was issued should be inadmissible at sentencing, and that the pre-indictment evidence by itself is insufficient to support an upward departure.

### a. Upward Departure Based Upon Pre–Indictment Evidence

We believe that enough pre-indictment evidence exists to support an upward departure. The Defendant's bodyguard testified that Defendant "threatened to pay someone to have [Kloss] killed," Tr. 11/7/95 at 109, and "said that he would gladly pay up to $20,000 to have her killed." *Id.* at 111. In addition, Alex Introcaso testified that Defendant asked him to find a hit man to kill Kloss. *Id.* at 141. One of Defendant's former co-workers also testified that Defendant said he was "going to kill her [Kloss]. I'm going to kill her." Tr. 11/9/95 at 125. And Defendant himself was recorded (before the indictment was issued) saying: "I think it's the only way out, because my next five years are gonna be a living hell if I don't do it that way," Tr. 3/27/95 at 6; "OK. Twenty grand is not bad," *Id.* at 10; "We gotta make sure we have, ah,

alibis though," Id. at 85; "Let's say he was gonna do it Saturday, which would be a good day cause that's the day she'd get drunk," *Id.*; and "I'm actually doin the world a favor by doin this." *Id.* at 91.

Defense counsel has argued that the pre–March 28, 1995 evidence of Defendant's intent to have Ms. Kloss killed is "the stuff of witness intimidation," and that it therefore should not be considered as separate grounds for an upward departure. Tr. 11/12/97 at 24. In reality, however, the conversations with Introcaso, Ramos, and Kline mentioned above were never made known to Kloss prior to Defendant's arrest. Therefore, these incidents could not have been direct attempts to intimidate her, and thus do not form the basis of the witness intimidation claim.[8] The fact that this conduct is not an element of any of the crimes of which Defendant has been convicted is exactly what prompts us to grant the upward departure in this case. After careful consideration of all of the evidence presented at trial, we conclude that the Sentencing Guideline recommendations, even with the obstruction enhancement under § 3C1.1, do not adequately represent the seriousness of Defendant's pre-indictment conduct, and that a six level upward departure is in order.

### b. Upward Departure Based upon Post-indictment Evidence

██ We believe that the post-indictment evidence, consisting of a recorded conversation between Defendant and an undercover officer posing as a hit man, is sufficient to independently support an upward departure. We also believe that the evidence of this conversation is admissible at sentencing.

The Sentencing Guidelines state that,

In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the

---

8. The basis of the witness intimidation claim is the conduct where Defendant pointed weapons at Ms. Kloss and threatened to kill her if she went to the FBI. Presentence Report ¶ 12. We note that Defendant's use of a weapon when intimidating Ms. Kloss would also warrant a six point upward departure under § 5K2.6—a departure we would be inclined to impose if we had not already penalized Defendant for the steps he took to have Kloss murdered.

defendant, unless otherwise prohibited by law. *See* 18 U.S.C. § 3661. Sentencing Guidelines § 1B1.4.

The Supreme Court has held that a sentencing court may consider conduct of which a defendant has not been convicted if the Government establishes such conduct by a preponderance of the evidence. *United States v. Watts,* — U.S. ——, ——, 117 S.Ct. 633, 634, 136 L.Ed.2d 554 (1997). The Court noted that "sentencing enhancements do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of his conviction." *Id.* at ——, 117 S.Ct. at 636.

The Third Circuit made it clear that Defendant could not be charged with attempted killing of a witness based upon the post-indictment conversation with the undercover officer. Accordingly, Defendant's conviction on this count was vacated. *Arnold,* 106 F.3d at 42. However, this does not necessarily mean that we may not consider this evidence at sentencing, especially since the witness intimidation conviction stands. It has been widely held that evidence which was inadmissible at trial may be considered at sentencing. *See e.g., United States v. Torres,* 926 F.2d 321, 325 (3d Cir.1991).

The defendant in *Torres* was convicted of possessing cocaine with intent to distribute, but a portion of the cocaine was suppressed at trial because it had been obtained in violation of the defendant's Fourth Amendment rights. The Third Circuit held that although the suppressed evidence could not be used at trial, it could be considered at sentencing so long as there were indicia sufficient to establish its reliability.[9] The court stated that the fact that "an unlawful search and seizure has occurred does not diminish the probative value of the illegally seized evidence in any way." *Id.* at 323. Under the reliability test identified in *Torres,* it is clear that the con-

versation between Defendant and the undercover police officer is admissible at sentencing in this case. There is no indication that the recorded conversation is in any way unreliable. In fact, defense counsel conceded the reliability of this evidence at the November 12, 1997 sentencing hearing. Tr. 11/12/97 at 31.

Defense counsel argues that the reliability analysis set forth in *Torres* should be limited to Fourth Amendment cases. For Fifth and Sixth Amendment cases, Defendant advocates a *per se* rule that evidence which is inadmissible at trial must also be excluded from consideration at sentencing. In support of this position, Defendant cites *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). The defendant in *Smith* had been convicted of a capital crime, and the prosecution was seeking to introduce testimony from a psychiatrist who had interviewed Smith to show that Smith would pose a future danger to society. At the time the psychiatrist interviewed Smith, neither Smith nor his attorney were told that the interview might be used to establish future dangerousness should a jury be called upon to decide whether or not to impose the death penalty.

Regarding the admissibility of evidence obtained in violation of a defendant's Fifth Amendment rights, the Supreme Court wrote,

> We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned. Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to **observe fundamental constitutional guarantees.**

*Smith,* 451 U.S. at 462–463, 101 S.Ct. at 1873 (emphasis supplied). The Defendant argues that this passage should be read to imply that evidence obtained in violation of a defen-

9. The *Torres* Court observed that the exclusionary rule is often applied to the Fourth and Fifth Amendments with differing results because the reliability of evidence obtained in violation of the Fifth Amendment (e.g. coerced confessions) is more often suspect than evidence obtained in violation of the Fourth Amendment. *Torres,* 926 F.2d at 322–323. However, the Third Circuit did not draw any bright line distinguishing between Fourth and Fifth Amendment violations. In fact, the Third Circuit noted that reliability is the key consideration in either scenario. *Id.* Thus, we decline to adopt by counsel's proposed *per se* rule barring the consideration of any evidence obtained in violation of a defendant's Fifth or Sixth Amendment rights during sentencing.

dant's constitutional rights should be barred from consideration at sentencing. We do not believe that *Smith* mandates this conclusion. In fact, if *Smith* were to be read in this way, *Torres* would very likely be bad law. If sentencing judges were uniformly prohibited from considering all forms of evidence obtained in violation of a defendant's constitutional rights, the evidence in *Torres*, which violated that defendant's Fourth Amendment rights, would have been excluded from sentencing proceedings. The Third Circuit declined to impose such a blanket exclusion, recognizing that the "unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury." *Torres*, 926 F.2d at 323, *citing United States v. Payner*, 447 U.S. 727, 734, 100 S.Ct. 2439, 2446, 65 L.Ed.2d 468 (1980). Given the indicia of reliability with regard to the recorded conversation at issue in the case at bar, we believe that we may appropriately consider this evidence in determining an appropriate sentence.[10]

We note that *Smith* may be distinguished from the instant case in other ways as well. The *Smith* Court wrote that,

> As the Court of Appeals observed, the decision to be made regarding the proposed psychiatric evaluation is literally a life or death matter and is difficult ... even for an attorney because it requires a knowledge of what other evidence is available, of the particular psychiatrist's biases and predilections, [and] of possible alternative strategies at the sentencing hearing. It follows logically from our precedents that a defendant should not be forced to resolve such an important issue without the guiding hand of counsel.

*Smith*, 451 U.S. at 471, 101 S.Ct. at 1877 (internal quotations omitted). The evidence at issue in *Smith* consisted of a psychological examination which the Government wished to introduce as evidence in determining wheth-

er the defendant would be sentenced to death. Defendant was not told at the time of the examination that the information gleaned by the psychiatrist could be used in such a way. In contrast, the interview between Defendant and the undercover officer posing as a hit man was not a "critical stage" of the aggregate proceedings against him. The recorded conversation at issue in the case at bar does not form the basis for any count of which Defendant stands convicted. Furthermore, this evidence would not change the sentence which is being imposed upon the Defendant. This court has identified multiple independent reasons for our decision to depart upwardly, and although the recorded conversation at issue lends support to this decision, it is not a keystone in the departure decision, without which the sentence would collapse.

*Smith* may be distinguished from the case at bar in yet another way. In *Smith*, the Supreme Court wrote that, "[g]iven the gravity of the decision to be made at the penalty phase, the State is not to be relieved of the obligation to observe fundamental constitutional guarantees." *Smith*, 451 U.S. at 463, 101 S.Ct. at 1873. The Court cites three cases in support of this proposition, *Green v. Georgia*, 442 U.S. 95, 97, 99 S.Ct. 2150, 2151–2152, 60 L.Ed.2d 738 (1979), *Presnell v. Georgia*, 439 U.S. 14, 16, 99 S.Ct. 235, 236–237, 58 L.Ed.2d 207 (1978), and *Gardner v. Florida*, 430 U.S. 349, 357–358, 97 S.Ct. 1197, 1204–1205, 51 L.Ed.2d 393 (1977). It is significant that each of these decisions, like *Smith* itself, involved a determination about whether a defendant could be sentenced to death. In contrast, the recorded conversation at issue in the case at bar merely provides redundant support for an upward departure. The Supreme Court has written,

> Death, in its finality, differs more from life imprisonment than a 100–year prison term differs from one of only a year or two.

---

**10.** We note that the reliability test has been used to determine the admissibility of evidence during sentencing when that evidence was excluded during trial for other reasons. *See e.g., United States v. Brothers*, 75 F.3d 845, 848 (3d Cir.1996) ("the sentencing court can give a high level of credence to hearsay statements, ... however, in order to avoid misinformation of constitutional

magnitude, we require that information used as a basis for sentencing ... have sufficient indicia of reliability to support its probable accuracy"); *United States v. Miele*, 989 F.2d 659, 663 (3d Cir.1993) (estimates of drug quantity in Presentence Report and not established at trial are admissible "only if they have some minimal indicium of reliability").

Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). We do not propose that all evidence obtained in violation of a defendant's Fourth, Fifth, or Sixth Amendment rights may be considered during sentencing. However, under the facts specific to this case, we find that the evidence offered by the Government is reliable and does not implicate the concerns identified by the Supreme Court in *Smith*. For this reason, we refuse to apply the exclusionary rule to prevent this evidence from being considered, by a judge, in deciding upon an appropriate sentence.

■ Defendant's next argument in favor of a *per se* rule excluding the evidence at issue cites a passage from *Torres*. That passages states,

> Implicit in the broad discretion granted the sentencing judge, however, is the necessity that the information be reliable and not bear on such impermissible factors such as race, religion, national origin, or be the result of coerced statements, uncounseled convictions and the like.

*Torres*, 926 F.2d at 324. The key phrase upon which Defendant relies is "uncounseled convictions." Defendant argues that his statements to the undercover officer posing as a hit man, made just after he had been indicted and outside the presence of his attorney, are analogous to uncounseled convictions. The two other Third Circuit cases we have found which use this phrase confirm our expectation that "uncounseled convictions" refers to instances where a defendant was tried and convicted of a crime without the benefit of a lawyer. *See United States v. Del Piano*, 593 F.2d 539, 542 (3d Cir.), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979); *United States v. Metz*, 470 F.2d 1140, 1143 (3d Cir.1972), *cert. denied*, 411 U.S. 919, 93 S.Ct. 1558, 36 L.Ed.2d 311 (1973). The Defendant in the instant case has not been convicted of any crime without having had the benefit of counsel. Instead, he did not have his attorney with him while

attempting to arrange the murder of a witness. Defendant's conviction for attempted killing of a witness has been vacated and his conduct in attempting to hire a man he believed to be a professional assassin does not form the basis for any of his remaining convictions. Therefore, it cannot be said that our decision to consider the March 28, 1995 conversation in sentencing Defendant bears "on such impermissible factors such as race, religion, national origin, or [considers] the result of coerced statements, uncounseled convictions and the like." *Torres*, 926 F.2d at 324.

■ Finally, we find no evidence supporting the contention that the meeting with the undercover officer was arranged in order to enhance the Defendant's sentence. *See Torres*, 926 F.2d at 325. Although the Government agents involved knew that an arrest was pending, we find that their motives in recording the conversation with the hit man were based solely upon preventing the murder of a key witness, Jennifer Kloss. As a matter of common sense, the Government must be free to protect witnesses from defendants who wish to murder them, and the mere fact that a defendant is also charged with witness intimidation should not be a license to kill. As a matter of policy under the Sentencing Guidelines, we sincerely believe that the Congress and the Commission would not intend that conduct as serious as this go unpunished. Indeed, the Sentencing Guidelines state,

> In resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.

Sentencing Guidelines § 6A1.3(a). Accordingly, we believe that the conversation recorded on March 28, 1995 may be considered when determining an appropriate sentence.

The recorded conversation consists of the following dialogue between the Defendant and a police officer posing as a hit man:

Officer: ... Sure you want this done?

Defendant: I think there's no other way.

Officer: OK. When it's done, I don't want you coming back to me you know crying on my shoulder or something, all right.

Defendant: Um huh. . . .

Defendant: And he did, he did say it's supposed to be an accident?

Officer: Yeah. I'll do something. I'll work something.

Defendant: Um huh.

Officer: It'll be nice and neat. All right?

Defendant: Is that everything?

Officer: That's it. That's all I need. He filled me in on everything, so.

Defendant: So you know her locations, and where she is and everything.

Officer: Yeah, he, Cedar Crest College and the whole deal. All right?

Defendant: All right.

Officer: Consider it done man.

Defendant: All right.

Tr. 3/6/95 at 2–3.

We find that Defendant's extremely egregious conduct removes this case from the heartland of bank larceny, money laundering, and witness intimidation cases contemplated by the Sentencing Guidelines. Not only did Defendant personally try to prevent Ms. Kloss from testifying against him, he went so far as to assemble a photograph of Kloss, a description of her car, and instructions on where she might be found, as well as over $20,000 so that a man he believed to be a professional assassin would murder her. Based on all of the evidence cited above, we find that the depraved indifference to human life and murderous intent evinced by Defendant remove his conduct from the heartland of cases contemplated by the Sentencing Guidelines. *See Koon v. United States,* 518 U.S. 81, ——, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392 (1996). Given the egregiousness of this conduct, we find that a six level upward departure is warranted in this case.

### 3. Amount of Overall Departure

■ We have arrived at a departure of six levels for three separate, independent reasons: (1) Defendant's failure to return all of the stolen money; (2) Defendant's pre-indictment plans to arrange Kloss' murder; and (3) Defendant's post-indictment conversation with an undercover police officer, in which Defendant tried to hire the officer to murder his ex-fiancee. The question remains as to the appropriate manner in which to apply these departures. Grounds (2) and (3) are sufficiently related to warrant their concurrent application. Coupling these grounds with Ground (1) would give a 12 point departure from the present Guideline level of 24. This would raise the sentencing range from 51–63 months to 188–235 months. This range would be consistent with our original sentence of 210 months. We predicated our original sentence principally upon the finding that the Defendant was a dangerous person. We based this finding upon the Defendant's large thefts of money, concealment of funds, and attempts at murdering Jennifer Kloss. The Defendant also owned a large number of firearms, including automatic weapons. Tr. 11/9/95 at 7; Tr. 2/22/96 at 96–97. Doctor Tepper indicated that the Defendant perceived himself to be a police officer. Tr. 11/9/95 at 83. In a separate matter, the Defendant admitted to having a confrontation with a motorist in which he drew a firearm. Tr. 11/8/95 at 140. The Defendant has been untruthful in sworn testimony on numerous occasions. We did not make the finding about Defendant's dangerousness lightly.

We are happy to say that we are pleased by the marked change we perceive in the Defendant, as evidenced by his improved attitude, presentation of certificates of accomplishment which he earned during his incarceration, and other evidence favorable to him. The defense made a motion for downward departure at the original sentencing. Tr. 2/26/96 at 144. While we have the legal authority to depart downward in true cases of post-offense rehabilitation, in exercising our discretion, we decline to make such a downward departure in this case. Nevertheless, we desire to encourage the Defendant to continue with his self-rehabilitation. Accordingly, after much thought, we have decided to make all the upward departures concurrent with each other rather than consecutive. This will yield a total Offense Level of 30, with a Guideline sentencing range of 97–121 months. We believe that this Offense Level

sufficiently deals with the totality of Defendant's conduct. We have chosen to make our departures concurrent with each other, but we note that any one of them standing alone would provide a sufficient basis to depart to Level 30.

## D. Restitution

At the time of our initial sentencing on February 22, 1996, we ordered Defendant to pay restitution in the amount of $223,569. This figure represented the total amount stolen by Defendant, less the amount recovered in cash or salable assets, plus the medical expenses claimed by Jennifer Kloss. The Third Circuit subsequently vacated that Order and requested that we issue more detailed findings about Defendant's ability to pay restitution and the appropriate timing and amount of the restitution payments.

At the resentencing hearing on November 12, 1997, we made it clear on the record that we were placing the burden of proof on the Government to establish the amount of the loss and the relationship of the Defendant to the loss. We placed the burden on the Defendant to prove his financial resources, the financial needs of his dependents, and his ability to pay. *See* 18 U.S.C. § 3664(e); *United States v. Copple*, 74 F.3d 479, 482 (3d Cir.1996). The burden of proof is by a preponderance of the evidence. *Id.* at 484. As the hearing progressed, the parties reached a stipulation that the court should enter an agreed Order of Restitution as follows:

(1) All personal property of the Defendant which is currently in the custody of the FBI or Government will be sold at auction within ninety (90) days of the date of this Opinion, and the proceeds will be immediately applied to making restitution on Defendant's behalf. (It is estimated that this auction may yield a sum of approximately $13,000.)

(2) During his three year period of supervised release, the Defendant can realistically earn and pay $300 per month toward restitution for a total payment of $10,800.

(3) During his period of imprisonment, the Defendant has the ability to earn $300 per year, and although the Defendant may make voluntary payments of restitution if he wishes, he will not be required to make restitution during imprisonment so that he may apply his earnings toward improving his education.

(4) The sum of $80,000 is immediately due and owing from the Defendant as restitution, and the court may order the same paid. Failure to pay this sum immediately shall not be a basis for a contempt or other enforcement proceeding, nor shall it prevent Defendant from entering a program of supervised release or satisfactorily completing the same. Defendant's consent to this portion of the Order is not an admission that there are outstanding funds from the theft which are available for restitution, however, if the FBI locates such funds, this Restitution Order shall be a sufficient basis for them to seize the same and apply it to restitution.

We have reviewed this agreed and stipulated Order, and believe that it represents a full, fair, and appropriate resolution of the restitution issues in this case consistent with applicable statutory and case law. We say this for the following reasons.

Federal statute provides that "the court, when sentencing a defendant convicted of an offense under this title [Title 18] ... may order ... that the defendant make restitution to any victim of the offense." 18 U.S.C. § 3663(a)(1). The defendant in this case was convicted of multiple offenses under Title 18.[11] The Sentencing Guidelines state that "the court **shall** enter a restitution order if such order is authorized under 18 U.S.C. §§ 3663–3664." Sentencing Guidelines § 5E1.1(a)(1) (emphasis supplied). We conclude that an order of restitution is appropriate in this case.

To determine the appropriate amount and timing of the Restitution Order, we must consider:

---

**11.** The bank larceny counts come under 18 U.S.C. § 2113(b), the witness tampering offense falls under 18 U.S.C. § 1512(b)(3), and the money laundering counts are codified in 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2.

■ the amount of the loss sustained by any victim as a result of the offense, [2] the financial resources of the defendant, [3] the financial needs and earning ability of the defendant and the defendant's dependents, and [4] such other factors as the court deems appropriate.

18 U.S.C. § 3664(a). We will consider these factors in turn.

The findings we are required to make may be based upon the Presentence Report or upon testimony and evidence presented at trial. Any dispute about such evidence is to be resolved by this court using a preponderance of the evidence standard. 18 U.S.C.

§ 3664(d). On the basis of facts established by a preponderance of the evidence at trial, and on the recommendation of the Presentence Report, we find that Defendant is able to pay restitution for the reasons and under the conditions identified below.

## 1. The Amount of the Loss

During Defendant's trial, the Government established a total loss of $222,140.00, of which $30,000 is attributable to Federal Armored and $192,140 to McGee Insurance. The Government credited the Defendant with funds recovered from the following sources:

| | |
|---|---|
| Parent's outhouse: | $211,000 |
| Undercover officer: | $ 10,115 |
| Defendant at arrest: | $ 10,194 |
| Defendant's home: | $ 22,901 |
| Bulletproof vest: | $ 2,000 |
| Jennifer Kloss: | $ 1,650 |
| Total: | $257,860 |

Presentence Report ¶¶ 13, 17, 18. Subtracting $257,860 from the total amount stolen, $480,000, leaves a total loss of $222,140. The defense indicated that they agreed with this calculation. Tr. 11/12/97 at 95.

The Presentence Report identifies three victims who suffered financial loss as a result of Defendant's actions: Jennifer Kloss, Federal Armored, and McGee Insurance. Defendant's former fiancee, Jennifer Kloss, has submitted medical bills totaling $1,428.99 for treatment of a back injury she sustained when Defendant pushed her into a bathtub. These bills include charges for physical therapy, medical treatment, and medication. This was contested by the defense and Jennifer Kloss did not appear at the hearing on November 12, 1997. Accordingly, we will disallow these claims.

The parties agreed that Defendant's former employer, Federal Armored, has sustained a loss in the amount of $30,000. This sum represents the deductible on the insurance claim filed by Federal Armored in relation to the money stolen by Defendant. Tr. 11/12/97 at 92. The remainder of the loss, $192,140, represents money which McGee Insurance was obligated to pay under an insurance policy as a result of the Defendant's

thefts. Therefore, we find that the Government has proven that Defendant's conduct directly resulted in a loss of $30,000 to Federal Armored and $192,140 to McGee Insurance.

■ We also find that the economic circumstances of these victims are reasonably similar, but that the amount of their losses differ substantially. Accordingly, restitution should be allocated proportionally to each loss amount, with Federal Armored receiving 14% of all restitution paid and McGee Insurance receiving 86% of all restitution paid.

## 2. Financial Resources of the Defendant

■ We are next required to consider the financial resources of the Defendant. 18 U.S.C. § 3664(a). Defendant has represented to this court that he has no assets or liabilities. *Presentence Report* ¶ 110. However, personal property and weapons taken from Defendant's former home have been reliably appraised at a value of approximately $13,075.00. *Presentence Report* ¶ 113. We find that an appropriate restitution award should include the amount of money generated by the sale of these assets. The Defendant agreed to this at his November

12, 1997 sentencing hearing. Tr. 11/12/97 at 104.

### 3. Defendant's Needs and Earning Ability

In fashioning an appropriate Restitution Order, we must also consider the Defendant's financial needs and earning ability. 18 U.S.C. § 3664(a).

#### a. Defendant's Financial Needs

The Defendant is going to be sentenced to a prison term. He has no dependents or outstanding debts. Therefore, we do not find any unique financial needs which would diminish the amount of restitution we see fit to impose.

#### b. Earning Ability

We have indicated that the Defendant will not be required to make restitution payments during his prison term. We believe that he can realistically be expected to pay restitution of $300 per month during the period of his supervised release. He initially proposed paying more than $400 per month, however, we viewed this as an unrealistic number in view of his vocational abilities, work history, and the stigma often applied to former convicts in employment situations. Accordingly, we declined to approve the suggested $400 plus figure and approved instead the stipulated $300 figure. We believe that Defendant will be able to find employment more than sufficient to support himself upon his release from prison. We note that he has held a number of jobs in the past, and with the major exception of the events at Federal Armored Express involved in this case, he appears to have been successful in his former employment. *Presentence Report* ¶ 99–108. Defendant will be on supervision for 36 months, meaning he will be able to contribute $10,800 toward the Restitution Order during this period.

### 4. Other Factors Influencing Defendant's Ability to Pay Restitution

We have approved a stipulated Order making $80,000 in restitution due and payable immediately, with certain conditions. We have previously found that Defendant has failed to account for between $80,000 and $100,000 of the money taken from Federal Armored Express. Tr. 2/22/96 at 56. We have repeated that finding in this Opinion. Defendant continues to maintain that he has not retained any of the stolen money. We do not credit his testimony in this regard for several reasons.

During a hearing on July 12, 1995 regarding his petition to have counsel appointed, Defendant testified under oath, before us in open court, that he had no property, cash, or other valuables, and that he could not afford to hire an attorney. Tr. 7/12/95 at 4–5. Defendant subsequently demonstrated the complete falsity of this sworn assertion when he reluctantly admitted to having $211,000 hidden away in an outhouse on his parents' property. Tr. 11/8/95 at 168–169.

The foregoing testimony occurred on cross-examination after the Defendant had admitted to taking the money in question, but denied the more serious charges in this case. The location of the money was revealed only after we twice ordered him to answer the government's questions. Defendant was therefore untruthful while under oath before this court on July 12, 1995.

The Defendant has evidenced a disingenuous attitude concerning the stolen funds. At a lengthy allocution prior to his initial sentencing on February 22, 1996, Defendant demonstrated his dogged persistence in this evasive attitude. Defendant spoke for over three hours, constantly attempting to shift blame away from himself and muddling the issue of where the stolen funds may have gone.

 There is no question that the Government has met its burden in establishing the total amount of the loss. Normally, the burden would be on the Defendant to establish his financial circumstances and ability to pay. We take this to include the obligation to establish that he has spent or otherwise disposed of the stolen funds and is therefore unable to make restitution. *Copple*, 74 F.3d at 484. We have not had a detailed accounting of any type from the Defendant. On the contrary, it is the Government—which did not have the burden of proof in this regard—that has carefully documented Defendant's

expenditures, which we find total $139,328. In addition, we find that $257,860 was recovered during the investigation and trial. We find that this leaves $129,672 unaccounted for by Defendant. Against this we weigh Defendant's bald insistence that he is not concealing any of the stolen money and the evasive, untruthful attitude Defendant has adopted in prior proceedings. Under these circumstances, we are again compelled to conclude that a substantial amount of money is still missing. We have found that the exact amount cannot be fixed with certainty, but that it appears to be somewhere between $80,000 and $100,000. Accordingly, a stipulated Restitution Order of $80,000 is proper.

### 5. Timing and Amount of Restitution

As we have noted, the exact amount to be realized from the sale of Defendant's property at auction is not known at this time. But it can be estimated at $13,000. Combining this $13,000 with the $10,800 he can be expected to contribute out of his earnings while on supervised release yields a total of approximately $23,800. In the event that the additional sum of $80,000 is paid or recovered this could bring the total restitution payment to approximately $103,800.

Because the amount of the Restitution Order is insufficient to compensate Defendant's victims for all of the losses they sustained, the Restitution Order will be divided proportionally among the two victims. As we have noted previously, Federal Armored will receive 14% of each restitution payment made by Defendant, and McGee Insurance will receive the remaining 86% of each payment.

We will order that Defendant's personal property be sold within ninety days. The proceeds of this sale will be divided, with 14% going to Federal Armored and 86% going to McGee Insurance. Any restitution payments Defendant chooses to make while in prison will be divided similarly, with 14% going to Federal Armored and 86% going to McGee Insurance. The $300 monthly payments which Defendant will be required to make during his period of supervised release will be similarly apportioned, with 14% ($42.00) going to Federal Armored and 86% ($258.00) going to McGee Insurance. Final-

ly, should the FBI recover the approximately $80,000 which remains unaccounted for, that money shall also be divided among the two victims, with Federal Armored receiving 14% and McGee Insurance receiving 86% of any such money.

### E. Remaining Objections to the Presentence Report

Defendant and his counsel have raised several objections to the Presentence Report. The first eight objections were presented by Defendant himself. The remaining objections were made by Defendant's previous attorney from the Federal Defender's office. We gave both the Defendant and his counsel a full opportunity to be heard at the sentencing hearing. We also asked the Defendant if he disagreed with anything his lawyer had said or not said or done or not done, and he did not indicate any disagreement. Tr. 11/12/97 at 118. We will address each of these objections in turn.

#### 1. Defendant's First Objection

Defendant argues that paragraph 16 of the Presentence Report indicates that $24,901 in cash was seized from Defendant's residence during the search of his home, while paragraph 17(d) states that $22,901 was found at the residence. At oral argument, counsel indicated their willingness to rest on their submissions with respect to this objection.

We are satisfied by the Probation Officer's explanation in the *Addendum to the Presentence Report,* which states that paragraph 16 refers to the total amount of cash retrieved at Defendant's residence, including the cash identified in paragraph 17(d) plus $2,000 which Defendant had hidden in a bullet proof vest, identified in paragraph 17(e). We therefore find that a total of $24,901 was recovered from the Defendant's residence during the search of his home.

#### 2. Defendant's Second Objection

The Defendant's second objection concerns the total amount of money labeled "unaccounted for" in the Presentence Report. During oral argument, the parties agreed to stipulate to the total net loss, as well as the

amount of restitution which Defendant would be required to pay. Tr. 11/12/97 at 96, 107–108. This objection is, therefore, moot.

### 3. Defendant's Third Objection

The Defendant next objects to the manner in which the five counts of conviction were grouped. We have dealt with this issue in section III(A) of this Opinion. For the reasons set forth in that section, Defendant's objection to the way in which his convictions were grouped is overruled.

### 4. Defendant's Fourth Objection

In his fourth objection, Defendant argues that this court cannot consider information describing his attempts to hire a hit man to murder his former girlfriend. This issues is addressed in detail in section III(C)(2) of this Opinion.

The Defendant also denies having said that he had to have Kloss killed and having suggested that he bring a picture of Kloss to Introcaso for the hit man. Regarding Defendant's desire to have Kloss killed, section III(C)(2) of this Opinion cites clear and convincing evidence to the contrary presented by the Government. Regarding Defendant's insistence that he never suggested that he supply a picture of Kloss, we believe that whether the Defendant suggested this action or merely agreed to it is irrelevant. We find that the Government has presented convincing evidence that the Defendant was willing to and did in fact provide such a picture. *See* Tr. 3/27/95 at 85 (Introcaso: "Okay. That way you give him a picture and you never had one." Defendant: "Okay.") and Tr. 11/8/95 at 61–62 (undercover officer testifies that the Defendant "furnished me with a picture of his fiancee, Jennifer Kloss"). The Defendant's fourth objection is, therefore, overruled.

### 5. Defendant's Fifth Objection

The Defendant's next objection relates to the conduct referred to in paragraph 78 of the Presentence Report. This conduct has to do with an alleged violation of a Protection from Abuse Order. As we noted during oral argument on November 12, 1997, we will not consider this paragraph when determining Defendant's sentence.

### 6. Defendant's Sixth Objection

In his sixth objection, the Defendant demands that property seized and described in paragraph 113 of the presentence report be returned to him and his family. The Defendant also argues that the estimated value attributed to this property is grossly low. During the November 12, 1997 resentencing proceeding, the parties agreed that this property would be sold within ninety days, and that the proceeds therefrom would be applied to the restitution award. Tr. 11/12/97 at 107–108. This objection is therefore moot as to both the value of the property and its return to Defendant or his family.

### 7. Defendant's Seventh Objection

The Defendant's seventh objection relates to the Government's request for an upward departure based on the Defendant's failure to return all of the stolen money. This issue has been discussed at length in section III(C)(1) of this Opinion. For the reasons offered therein, this objection is overruled.

### 8. Defendant's Eighth Objection

The Defendant next objects to the Government's proposed justification for upward departure based upon Defendant's attempt to hire a hit man to murder Jennifer Kloss. In the alternative, Defendant argues that his role in this attempt was minimal, entitling him to a two level decrease under § 3B1.2. Section III(C)(2) of this Opinion addresses the upward departure argument in detail. Regarding Defendant's § 3B1.2 argument, we note that Defendant was not charged with being part of a criminal conspiracy. Section 3B1.2 Application Note 1 states that "[s]ubsection (a) applies to a defendant who plays a minimal role in concerted activity." We find that no concerted activity has been alleged, and that application of § 3B1.2 to this case would be inappropriate. The Defendant's objection is, therefore, overruled.

### 9. Defendant's Ninth Objection

Defense counsel argues that the counts of conviction should have been combined into a single group under Sentencing Guidelines § 3D1.2. Section III(A) of this Opinion addresses this argument. For the reasons stated therein, this objection is overruled.

### 10. Defendant's Tenth Objection

Defense counsel objects to two factors upon which the Government seeks upward departure: the unfounded allegation that Defendant still has stolen money secreted somewhere, and the allegation that Defendant sought to have his former girlfriend murdered based upon a conversation which took place in violation of Defendant's Sixth Amendment rights. We have discussed both of these arguments at length in sections III(C)(1) and III(C)(2)(b) of this Opinion, respectively. For the reasons provided therein, Defendant's tenth objection is overruled.

### IV. CONCLUSION

We hold that the grouping of counts suggested by the Presentence Report is legally sound. Defendant's base Offense Level therefore stands at 22. We have also found that a two level § 3C1.1 enhancement for obstruction of justice is warranted, bringing the offense Level to 24. In addition, we have imposed a six level upward departure based upon Defendant's failure to return all of the money he stole and his attempt to have his former fiancee murdered to prevent her from testifying against him. This upward departure brings Defendant's Offense Level to 30.

For a Level 30 Offense, the Sentencing Guidelines recommend a sentence of 97 to 121 months for a defendant with a Criminal History Category of I. We have given careful consideration to the arguments made by the Government and defense counsel regarding the appropriate sentence to impose in this case and by agreement of the Government and defense, we will impose sentence at a later hearing to be scheduled by this court. An appropriate Restitution Order follows.

### *RESTITUTION ORDER*

AND NOW, this 24th day of November, 1997, consistent with the foregoing Opinion and by agreement of the parties, IT IS HEREBY ORDERED THAT:

1. All personal property of the Defendant which is currently in the custody of the FBI or Government will be sold at auction within ninety (90) days of the date of this Opinion, and the proceeds will be immediately applied to making restitution on Defendant's behalf;

2. During his three year period of supervised release, the Defendant can realistically earn and pay $300 per month toward restitution for a total payment of $10,800;

3. During his period of imprisonment, although the Defendant may make voluntary payments of restitution if he wishes, the Defendant will not be required to make restitution so that he may apply his earnings toward improving his education;

4. The sum of $80,000 is immediately due and owing from the Defendant as restitution, and the court orders the same to be paid immediately. Failure to pay this sum immediately shall not be a basis for a contempt or other enforcement proceeding, nor shall it prevent Defendant from entering a program of supervised release or satisfactorily completing the same. If the FBI locates such funds, this Restitution Order shall be a sufficient basis for them to seize the same and apply the money to restitution.